## LYENS *et al. v.* THE STATE.

1. While one is attempting, without provocation, to commit a felony on another, the latter will not be justified in killing the former unless there is a necessity to do so to prevent the commission of such felony, or the circumstances are such as to excite the fears of a reasonable man that such necessity exists, and the slayer really acts under the influence of such fears in killing his assailant.

2. The court charged the jury "that direct and positive evidence is rather to be believed than negative evidence where the witnesses are of equal credibility, and that a witness who testifies positively to the occurrence of a fact is rather to be believed than many witnesses who testify that they did not see the occurrence, provided they are of equal credibility, and provided further that they all have equal opportunity for knowing the facts about which they testify." This charge was not subject to the objection that the jury was liable to understand therefrom that the witness swearing positively was not rather to be believed than the witnesses swearing negatively if the former had *better* opportunity than the latter for knowing the facts about which the testimony was given.
3. In the trial of a murder case, if at the time of making declarations the condition of the wounded party making them, the nature of his wounds, the length of time after making the declarations before he expired, and all the circumstances make a prima facie case that he was in the article of death and conscious of his condition when he made the declarations, such declarations should be admitted in evidence by the court, under proper instructions to the jury.
4. Where one contributes to a fund to be used in employing an attorney to aid the solicitor-general in the prosecution of a particular person for an alleged offense with which he is charged, and the attorney does render such aid upon the trial of the case, the person so contributing is to be considered as a volunteer prosecutor, and one who is related within the fourth degree to such volunteer prosecutor is not competent to sit as a juror on such trial.

Argued October 19,—Decided December 22, 1909.

Indictment for murder. Before Judge Parker. Wayne superior court. August 27, 1909.

*W. W. Bennett, J. R. Thomas, Brown & Parker, L. L. Thomas,* and *Twiggs & Gazan,* for plaintiffs in error.

*John C. Hart, attorney-general, J. H. Thomas, solicitor-general, Wilson, Bennett & Lambdin, J. H. Morris, R. L. Berner,* and *R. E. Dart,* contra.

HOLDEN, J. The defendants were indicted for the murder of Fleming Smith, and upon their trial the jury rendered a verdict of guilty, with a recommendation to mercy. To the order of the court refusing a new trial they excepted. Fleming Smith, the deceased, was a clerk in the drug-store of the Jesup Drug Company, and it was in this store that the shooting occurred, on the night of December 12, 1908, which resulted in his death. A witness for the State, J. J. Hill, testified that on the morning of the day on which the killing occurred, W. B. Lyens, one of the defendants, stated to him: "I cursed him [Fleming Smith] out yesterday evening and last night, and I am going to see him again. . . I said enough

to him yesterday evening to make a man kill another." A part of the testimony of W. R. Williams, a witness for the State, was substantially as follows: He saw W. B. Lyens between eight and nine o'clock on the morning of the day the deceased was killed. Lyens seemed to be worried and somewhat excited at the time, and stated, "that Mr. Smith had been talking about him, but that he knew that Mr. Smith was not able to fight him, but said that Smith could fix himself·so that he would be as big a man as he was, and said he was willing to fight him anyway." The witness was in the drug-store when the defendants walked in with their hands in each pocket of their overcoats. When the defendants walked in, Mr. Smith said, "Sheriff, is there something you will have?" Mr. Lyens said, "No, there is nothing I will have," and stood there a second or two and then said, "What is in these boxes in the show case?" When he said that I turned around and walked out. I do not know what Mr. Smith's answer was; at that time, however, he was wiping his hands with a rag as·he had been picking some ice out of the soda fount. I reckon the defendants had been in the store some 10 or 15 seconds before I went out, and they were leaning up against the show-case on the left-hand side of the store as you go in. Each one of the defendants had on an overcoat. When the shooting commenced I had gotten about 10 feet inside of Kicklighter's store. The first shooting I heard went like a pistol, and then the shooting kept up a little piece and then there was a slack in it, and about that time I thought I would go around and peep in there during this lull. I mean by lull that the firing stopped for a second or two and this is what I called the lull. I did not hear the shotgun fire before the pistols fired. I heard the shotgun afterwards, the last of the firing. These pistol shots, after they commenced firing, come in just as rapid succession· as you would hear if a package of fire-crackers were set off. There must have been at least 20 shots fired. Towards the last of the shooting I heard a loud report." Mitch Thomas, a witness for the State, testified in part as follows: "The first thing I saw the defendants do after the shooting started was to advance towards the prescription case while they were shooting. Then I run a few jumps and stopped, and then saw Mr. Smith about the center of the prescription case. When I saw him he was kinder staggering or making towards that opening that comes this way towards the side door of the drug-store. Mr. Lyens

then caught him by the shoulders just as he entered the opening there between the prescription case and the end of the counter on the left-hand side of the door, and they had a kinder little struggle, and Mr. W. B. Lyens jerked Mr. Smith down and then Archie Lyens run up to him and jabbed his pistol to him [Smith] and shot him. I think that Archie Lyens then shot him [Smith] twice, and Mr. Smith went to the floor, and I saw W. B. Lyens get the gun. . . Mr. Lyens then got the gun and hit Mr. Smith on the head with the breach of it, and then turned and fired the gun and come on to Mr. Smith overhanded. When Lyens fired the gun he fired it in the front of the building. He fired the gun once, and then the other report was just after that like this [indicating by popping fingers in quick succession]. After I went in the building I heard W. B. Lyens say, 'We have got him, God damn him, he shot at me first.' . . Before these last two shots which I have described as being fired from a shotgun, I heard no shots except pistol shots. When I went in the store I told Lyens not to shoot Smith any more, and Smith said that Lyens had killed him and that he [Lyens] had not given him [Smith] a chance for his life, but that he had killed him and that it was not necessary for him [Lyens] to shoot him [Smith] any more."

There was evidence that the deceased lived only a short while after the shooting occurred, and said, after he was shot, that he did not shoot at the defendants at all, and that W. B. Lyens held him while Archie Lyens did the last shooting. There was also evidence on the part of the State that there were powder burns on the clothes of the deceased, and powder burns in the flesh where the wound in the side was inflicted, and that this wound in the side of the deceased caused his death.

There was testimony on the part of the defendants, that the deceased, about a month before the homicide, stated that he "was going to kill sheriff Lyens if it was five years." Moses Brinson, a witness for the defendants, testified, in part, as follows: "After sheriff Lyens and his son entered the store they went to the opposite side of the store and leaned up against the show-case and stood with their backs to the counter. When the defendants entered the store Mr. Smith said, 'Is there something, Sheriff?' and Mr. Lyens said, 'No, nothing just now.' Shortly after that Mr. Lyens said, 'Fleming, what is in those boxes?' and Mr. Smith said,

'Candy, Sheriff.' I discovered nothing in the tone of voice of either that would indicate that either was mad or excited, but their voices seemed a little strained. Of course it might have been imagination on my part, but it seemed that Mr. Lyens was talking in a strained voice and that Mr. Smith was talking in a strained voice. All this time Mr. Smith was shaving off some ice, and he put the ice down and wiped his hands and went in the back part of the store and come out with a shotgun across his shoulder. At the time he come out from behind the prescription case he said, 'Mr. Sheriff, did you come in to see me?' and then the gun went off. I mean the gun that Fleming Smith held is the one that went off in the direction of the front door. Mr. Lyens was sorter at right angles with Mr. Smith, and sorter ducked down just as the gun fired. . . I left the drug-store while the shooting was going on. When the shooting began and after it began I hid behind the soda fount, and I looked up one time and the defendants were going back this way—rushing back towards the end of the store."

The defendant, W. B. Lyens, in his statement said that while in the store the deceased asked him, "Is there something for you?" This defendant asked Mr. Smith what was in some boxes, to which Smith replied, "Candy, Sheriff." Smith disappeared behind the prescription counter, and this defendant and his son turned and started to walk out of the store, when he heard Smith say, "Sheriff Lyens, do you want to see me to-night," to which the sheriff replied, "No." This defendant saw the muzzle of a gun in the hands of Smith, pointing towards his head. His son was then standing by his side. "We dropped to the floor as quick as we could, and the gun fired right over us. Now where these shot hit I do not know. When we began firing we both drew our pistols. I drew one, and I had two, and we both shot where Mr. Smith was, but I do not remember how many shots we fired from that position." The defendant did not see any chance to get out of the door, and there was nothing for the defendants to hide behind. The only thing he thought of was to get to the other end of the prescription counter, where there were some boxes and where there was a side door. When the defendants reached this point, the deceased ran around and cut them off and the deceased and both the defendants met there, and "We shot him from behind the boxes." The defendant was down on his knees behind the boxes, looking up, and the de-

ceased ran there and tried to shoot him over the boxes, but they were so high he could not "do it very fast." The defendant grabbed the gun by the muzzle and shoved it up, and the gun fired. "Archie fired from behind me and over at Mr. Smith; both of them were firing over me. Mr. Smith shot towards the front of the house, and Archie was shooting towards the back of the house. I looked back and saw Archie and thought he was killed, and he staggered back two or three steps like that, and I still held the gun and stepped from behind the boxes just like that [indicating], and me and Mr. Smith got to tussling over the gun, and finally I wrenched it from his hands, and as soon as I grabbed the gun and wrenched it from his hands he threw his hand back in his pocket but never come out, but I could tell it was a pistol, and I struck him across the head with the gun, and he staggered back and fell against the wall like this, and then recovered and come over in front and said: 'Sheriff, I will not shoot any more; you've got me.' . . At the time I hit him with the gun I had shot both pistols out; and I was satisfied that Archie had shot both of his out, from the number of shots." The other defendant's full statement was as follows: "Gentlemen, the statement that my father made is true, and the hat I had on was shot. He shot at us first without any provocation at all, and we had to shoot to save our own lives. That is all I can say."

1. One of the grounds of the motion for a new trial is that the court refused to give the jury a charge, duly requested in writing, as follows: "Gentlemen of the jury, I charge you further in this case that if you find from the evidence, and from all the facts and circumstances in the case, that the deceased made a felonious assault upon these defendants and without provocation, that they would have the right to continue their defense against such assault until they had overcome their assailant or he had desisted from such assault, and all the facts and circumstances were sufficient to show to the defendants that he had really and in good faith abandoned the attack." The evidence shows that the defendants fired about 20 shots, and continued to shoot until the deceased was mortally wounded; and the language used in the charge requested, namely, "they would have the right to continue their defense against such assault until they had overcome" the deceased, might have impressed the jury with the idea that the defendants, under the cir-

cumstances narrated, would have had the right to kill the deceased. If the deceased made a felonious assault upon the defendants without provocation, the defendants would have no right to continue their defense against such assault and kill the deceased simply because the deceased had not desisted from such assault and the facts and circumstances were not sufficient to show to the defendants that the deceased really and in good faith had abandoned the attack. If the deceased without provocation made a felonious assault on the defendants, and before the deceased desisted therefrom the defendants began to shoot at the deceased because of such assault, they would have no right to continue shooting at the deceased until they killed him, unless there was a necessity on the part of the defendants to kill the deceased to prevent the commission of a felony on them, or *the facts and circumstances were sufficient to excite the fears of a reasonable man* that the deceased was about to commit a felony on the defendants, and the defendants, in killing the deceased, acted under such fears.    The jury would probably understand the words "felonious assault" to mean an attempt to commit a felony.    The charge requested justified the defendants in killing the deceased simply because the deceased had not desisted from a felonious assault begun and continued without provocation, and the circumstances did not show to *the defendants* that the deceased had abandoned the assault.    It may be true that the deceased had not desisted from a felonious assault begun and continued without provocation, and it may be true that the facts and circumstances were not sufficient to show *to the defendants* that the deceased had abandoned his felonious assault on them, and yet it might be true that there was no necessity to kill the deceased to prevent the commission of a felony, and the facts and circumstances might not be such as to excite the fears of a reasonable man that the deceased was about to commit a felony upon the defendants.    The charge made the defendants the judges of whether or not the deceased had abandoned the felonious assault upon them, and justified the defendants in killing the deceased simply because the deceased had not desisted from the felonious assault and the circumstances did not show to the defendants that the deceased had abandoned such assault.    If the deceased without provocation made a felonious assault on the defendants, they would have no right to make a defense against such assault by taking the life of the deceased,

38

unless there was a necessity to do so to prevent the commission of a felony, or the circumstances were such as to excite the fears of a reasonable man that it was necessary to take the life of the deceased in order to prevent the commission of a felony on them. One may be attempting to commit a felony on another, yet he may not be "one who manifestly intends or endeavors" to commit a felony as provided in the Penal Code, §70. One may be attempting to commit a felony on another, and yet the attempt may be such as does not make it necessary for such other person to kill him to prevent the commission of such felony, and the circumstances may not be sufficient to excite the fears of a reasonable man that such necessity exists. We think the court was justified in refusing the request as made. *Williams* v. *State,* 120 *Ga.* 870 (48 S. E. 368); *Jackson* v. *State,* 91 *Ga.* 271 (18 S. E. 298, 44 Am. St. R. 22). Whether the charges given, wherein the court detailed facts and circumstances under which the defendants would be justified in killing the deceased, conditioned upon the defendants having entered the drug-store upon a peaceful mission, covered all the issues in this case in regard to justifiable homicide raised by the defendants' evidence and their statements to the jury, need not be considered.

Several requests to charge upon the subject of reasonable doubt were made; but there was no error in refusing them, in view of the entire charge upon this subject. *West* v. *State,* 119 *Ga.* 119 (45 S. E. 973). Charges embodied in the other requests refused by the court were covered by the general charge, and there was no error requiring a new trial in such refusals.

2. One of the grounds of the motion for a new trial was as follows: "Because the court erred, upon the trial of said case, in charging the jury as follows: 'Gentlemen of the jury, I charge you that direct and positive evidence is rather to be believed than negative evidence where the witnesses are of equal credibility, and that a witness who testifies positively to the occurrence of a fact is rather to be believed than many witnesses who testify that they did not see the occurrence, provided they are of equal credibility, and provided further that they all have equal opportunity for knowing the facts about which they testify.' The error in this charge being that the court instructed the jury therein that the positive testimony of a witness is rather to be believed than the negative testi-

mony of many witnesses as to the same matter only when they all have equal opportunity for knowing the facts about which they testify, and that the testimony of one witness who testifies positively to the occurrence of a fact is rather to be believed than the testimony of many witnesses who testify that they did not see the occurrence only when all have had an equal opportunity for knowing the facts about which they testify." If the jury was liable to understand from the charge that a witness who testifies positively to "the occurrence of a fact" is rather to be believed than many witnesses who testify that they "did not see the occurrence" *only* when the witness testifying positively and the other witnesses had an equal opportunity "for knowing the facts about which they testified," such charge would be error; because the witness testifying positively to the "occurrence of a fact," if he had a *better opportunity* for knowing "the facts about which" he testifies than the other witnesses who testified "that they did not see the occurrence," such witness swearing positively, if he was equally as credible as the other witnesses, would certainly be "rather to be believed" than the other witnesses. We do not think, however, that the jury was liable to be misled by the charge into such error. There would be as much reason why the jury should have construed the charge to mean that they could not give more credence to the testimony of the positive witness than to that of those testifying negatively, if the latter were of less credibility than the positive witness, as for them to understand that a positive witness having better opportunity for knowing the facts than the witnesses testifying negatively was not entitled to the greater credence under such circumstances, but they were only to give greater weight to the testimony of the positive witness when both classes of witnesses had equal opportunity to acquire knowledge of the facts testified about. If the witness swearing positively is rather to be believed than many witnesses swearing negatively, if the former had equal opportunities with the latter for knowing the facts about which they testify, certainly the former is rather to be believed than the latter if he has *better* opportunity than the latter for knowing such facts.

Another ground of the motion for a new trial is that the court erred in charging the jury as follows: "If the defendants were there acting together, both engaged in the shooting of the deceased, both would be equally guilty under the law, or both would be

equally justified under the law." We do not think the charge quoted full enough on the subject about which the court intended to charge. Except what may be gathered from the statements in regard to the defendants "acting together, both engaged in the shooting of the deceased," nothing is said in the charge about any common intent of the defendants, or any concert of action between them, or one aiding and abetting the other who did the killing, if the killing was the result of shots fired by one of the parties alone. We do not think, however, in view of all of the evidence in the case, and the other portions of the charge, that there was error in this portion of the charge sufficient to warrant a new trial upon any of the grounds of objection made thereto.

There was no error, for any reason assigned, requiring a new trial, in the other charges given, or omissions to charge, of which complaint is made.

3. One of the grounds of the motion for a new trial is that the court, over the objection of the defendants' counsel, admitted the testimony of a physician who testified to statements made by the deceased as follows: "He [Fleming Smith] stated, 'I guess I am done for,' and some similar remark, and then he uttered a short prayer which I can not exactly repeat, and then he said, 'I would love to live to prosecute these men.' He said further that Archie Lyens had shot him first, and then they both shot him, and then W. B. Lyens held him while Archie Lyens did the last shooting. In reference to his shooting, Mr. Smith said he did not shoot at all. Physically the deceased's pulse was scarcely perceptible, and he complained of suffocation and he asked for air." Other testimony of the same witness substantially the same as that above quoted was included in the testimony to which objection was made. The ground of the objection was that it did "not appear that the deceased, whose dying declaration was sought to be introduced, was conscious of his dying condition at the time the statements were made." A portion of the testimony of the witness was substantially as follows: When he reached Smith a short time after the shooting, his pulse was "scarcely perceptible," and the blood was gushing from his left side. "It was in continual flow, and as he would breathe and exhaust air, there would be flushes of blood." After the witness saw him, he lived an hour and twenty minutes. The deceased complained of being suffocated. Other witnesses testified that

after the shooting was over, Smith, before being removed from the drug-store, said "Lyens had killed him," and "it was not necessary for him [Lyens] to shoot him [Smith] any more." The testimony of the physician and other witnesses, the character of the wound, the short time the deceased lived after the statements were made, were sufficient to make a prima facie case that the deceased was in the article of death and conscious of his condition when he made the declarations, and the court committed no error in admitting them in evidence. *Jones* v. *State,* 130 *Ga.* 274 (60 S. E. 840).

It is complained that the court committed error in admitting in evidence the testimony of a physician as to statements made by the deceased, " 'I would love to live to prosecute these men,' . . He offered a short prayer," on the ground that such declarations did not relate to the cause of his death and the person who killed him. These declarations on the part of the deceased were admissible to illustrate the question as to whether or not, at the time he made the other declarations admitted in evidence, he was in the article of death and conscious of his condition.

4. One of the grounds of the motion for a new trial was that a juror by the name of Fields was related as nearly as second cousin by marriage to W. O. and H. L. Strickland, who contributed to the fund to employ Hon. John W. Bennett as attorney to prosecute the defendants, who under such employment did appear and prosecute the defendants upon their trial, which resulted in a verdict of guilty. It appears that the names of the Stricklands were among those called as the names of those who employed and paid Bennett to prosecute the defendants, and of whose relatives it was sought by the court to purge the jury, and were held by the trial judge to be illegal and incompetent jurors to serve upon the trial. In an affidavit it is stated that the names of the Stricklands were "read out to the jurors in testing their competency in said case." It appears that the wife of the juror Fields was related within the fourth degree to the Stricklands. In the affidavit of the juror Fields he states that he did not know until after the trial that his wife was thus related, and "Deponent further swears, that, so far as he knows or ever heard, neither of said Stricklands took any part whatever in the prosecution of said case, except that deponent has heard since the trial that they contributed $5.00 each towards the employment of counsel. Deponent further swears that neither of

said Stricklands assisted in the striking or selecting the jury, or aided or rendered any service whatever in the prosecution of said case within the knowledge of deponent, or did any act that would put deponent on notice that they had any interest whatever in the trial of said case." Neither of the defendants, nor their counsel, knew of this relationship until after the trial. H. J. Strickland, in his affidavit used on the hearing of the motion for a new trial, stated that he knew that there was a relationship, but did not recall it at the time of the trial. He further stated that he took no part in the prosecution further than to contribute $5 towards a fund to employ counsel to prosecute the case, and "That the only desire and aim was that justice might be done in the premises, and this is the only interest he took in the trial of said case. That he had nothing to do with the employment of counsel and did not select or employ any one, but merely contributed to the fund to be used for that purpose." Was Fields disqualified as a juror by reason of his relationship to the Stricklands? We think he was. The Stricklands may not have been attorneys, and for that reason could not have appeared and assisted the solicitor-general in asking questions of the witnesses and in addressing the jury urging them to convict the defendants. They employed counsel to render this aid to the prosecution. Bennett assisted the solicitor-general and in one sense represented the State; in another sense he represented the Stricklands. He acted as their agent and attorney to do what they probably could not do because of not being licensed attorneys. The Stricklands themselves did not render any service to the State, but their zeal and interest were enlisted on the side of the prosecution to the extent of parting with their money to obtain the services of another to appear in the case as their representative, who could, perhaps, render services towards securing the conviction of the defendants, of more value than they themselves could. As indicated in the affidavit of H. L. Strickland, it may be that the Stricklands helped employ counsel with no desire to convict the defendants if they were not guilty. The desire to convict persons accused of crime only in the event they are guilty probably exists with the majority of persons who are prosecutors, with their names on the indictment as such. But generally a party does not employ and pay counsel to prosecute another for a crime with which he is charged, unless it is because the party employing counsel believes

the party prosecuted to be guilty and wishes him convicted.   It was held in the case of *Hicks* v. *State,* 126 *Ga.* 80 (54 S. E. 807), that one who signs a petition to call a special term of court for the purpose of trying one accused of crime is not disqualified from sitting as a juror upon the trial of such person.   But the person signing such a petition occupies a different position from one employing an attorney to aid in prosecuting a prisoner for a particular offense with which he stands charged.   The employment by one of an attorney to aid in the prosecution of a particular person on trial, when such attorney could perhaps render towards securing a conviction more efficient service than the one employing him, by aiding the solicitor in striking the jury, examining the witnesses, and otherwise acting in the preparation and conduct of the case, and in addressing the jury, would, generally speaking, be as much or more evidence of an interest in the trial, and belief in the guilt of the prisoner and a desire for his conviction, than the rendition of personal service by one who was not a licensed attorney, in striking a jury and otherwise aiding the prosecution.   No defendant on trial generally would want as jurors to pass upon his guilt or innocence persons nearly related to one who has employed an attorney to aid in securing his conviction and who does render such aid during the trial.   The person employing an attorney for this purpose is not merely a partisan for the State; he renders aid of the most active and valuable kind to the prosecution through his agent employed for that purpose.   This case is not like the cases of *Atkinson* v. *State,* 112 *Ga.* 411 (37 S. E. 747).   In the case of *Dumas* v. *State,* 62 *Ga.* 58, it was ruled: "The nephew of a county commissioner is not a competent juror, if the uncle has taken part officially in promoting the prosecution, by voting county funds to pay a reward for the prisoner's apprehension, by aiding to employ counsel to prosecute, and by aiding in the preparation of the case, the indictment being a special presentment of the grand jury.   The uncle is to be considered as a volunteer prosecutor, no law requiring him to perform that function as a county commissioner."   In the case under consideration, the Stricklands aided, with their own funds, "to employ counsel to prosecute" these defendants; and while the Stricklands did not personally aid "in the prosecution of the case," they did this through an agent employed by them for this purpose.   We have been asked to review and

overrule the decision in the case of *Dumas* v. *State*, but, after careful consideration, we decline to do so. In *Beall* v. *Clark*, 71 *Ga.* 818, it was held: "Where, after the trial of a case, the defendant discovered testimony to show that complainants, desiring to have a leading witness on the stand personally, entered into a contract with him that, if the testimony of the witness resulted in recovering certain plantations, they would employ him to oversee such places at a salary of $1,500 per annum, and that one of the jurors was a half brother of such witness, a new trial should have been granted." On page 849, it was said: "The trial by jury can not be too carefully guarded, to protect it not only from unfairness, but also from any uncertainty on that score. Jurors should be above suspicion. Omni exceptione majores." Also see *Almand* v. *County of Rockdale*, 78 *Ga.* 199, 200. Upon the general subject we have discussed, see the decisions collated in note in 9 Am. & Eng. Ann. Cases, 312. We do not think it matters that the Stricklands did not pay the entire amount of the fee of Bennett and did not personally make the contract whereby he was employed; and it matters not, under the facts of this case, that the names of the Stricklands were not on the indictment as prosecutors. Nor does the fact that the juror did not know of his relationship to the Stricklands until after the verdict was rendered make him a competent juror. In the case of *McElhannon* v. *State*, 99 *Ga.* 672 (26 S. E. 501), it was held: "On the trial of an indictment for mutilating and destroying the books of a corporation with intent to defraud and injure it, persons related to its stockholders within the prohibited degree are not competent to serve as jurors; and in determining whether or not a new trial should be granted to the accused because of relationship between jurors and stockholders, the fact that the former at the time of the trial were ignorant of any relationship between themselves and some of the stockholders is immaterial." Also, in this connection, see *Moore* v. *Farmers' Mutual Ins. Asso.*, 107 *Ga.* 199 (33 S. E. 65); *Bank of the University* v. *Tuck*, 107 *Ga.* 211 (33 S. E. 70). Where one contributes to a fund to be used in employing an attorney to aid the solicitor-general in the prosecution of a particular person for an alleged offense with which he is charged, and the attorney does render such aid upon the trial of the case, the person so contributing is to be considered as a volunteer prosecutor, and one who is related within

the fourth degree to such volunteer prosecutor is not competent to sit as a juror on such trial.

We deem it unnecessary to pass upon the remaining questions in the motion for a new trial, as the occurrences of which complaint is made are not likely to be repeated on another trial.

*Judgment reversed. All the Justices concur, except Beck, J., dissenting.*