1. Alleged newly discovered evidence was no cause for new trial.
2. Conspiracy may be shown by circumstantial evidence.
3. Rulings as to sufficiency of evidence to show that witness was accomplice, and to authorize instruction to jury on law of conspiracy.
4. Refusal to receive answers to specified questions, on examination of witness as to reputation of the accused, was not error. *Page 140 
5. Disqualification of jurors not shown by affidavit alleging contribution of money to aid prosecution.
6. Evidence supported verdict of murder.
 No. 13899. NOVEMBER 12, 1941.
On February 3, 1941, H. H. (Homer) Newton, George Turner, and Theodore Mills were jointly indicted in Tattnall County for murder of G. F. (Fred or Fed) Flanders, by shooting him with a shotgun. On February 5, 1941, Mills was put on separate trial, and on February 7 the jury returned a verdict finding the defendant guilty with a recommendation to mercy. A motion for new trial on the general grounds and several special grounds was overruled, and the movant excepted. The following narrative is gleaned from evidence admitted without objection, and from the defendant's statement before the jury, though there was contradictory evidence to certain parts of the evidence. Flanders lived with his wife and children in an apartment in the second story of "the Gore House" in the town of Collins, and worked at Hinesville in Liberty County. He had been so engaged for about three months, and had been accustomed to go and come from his work with Ula B. Kennedy, who carried him and several other neighbors in an automobile. They would leave between five and six o'clock in the morning. In approaching the house Kennedy would blow a signal and pass beyond, picking up his other passengers and returning in about ten minutes for Flanders. The house was about seventy yards from the railroad depot. A porch about three feet above the ground was on the outside of the house, and at the outer edge of the porch were certain railings. A glass window in the house was screened by wire on the outside. Opposite the window was a stairway inside the house, leading up to the second story, so that a person descending the stairway would be facing the window through which he could be seen by a person on the ground at the outer edge of the porch, a distance of about ten or twelve feet from the foot of the stairway. In the early morning of December 31, Flanders prepared to leave for his work. Between five and six o'clock (before daylight) Kennedy approaching the house blew a signal, and went on for his other passengers. Flanders, after a few remarks to his wife and child, left his apartment and proceeded down the stairway. Mrs. Flanders heard the discharge of a gun, and ran to the *Page 141 
scene. Kennedy, returning with his passengers, saw the flash and heard the shot as he was approaching the Gore House. Flanders had been mortally wounded near the bottom of the stairway, and died in about five minutes.
The perpetrator of the crime disappeared without being seen, and his identity required resort to circumstantial evidence. Tracks were found at the edge of the porch, and a hole in the wire screen and another in the window glass, indicating that the shot had been fired from the outside at close range. Gun-wads were found, one in the clothes of the victim and one under the window, indicating that the shot had been fired from a sixteen-gauge shotgun that would chamber twelve number one buckshot. Examination of the body disclosed that twelve number one buckshot had entered the body. Mills, the defendant on trial, had a sixteen-gauge shotgun. An old slab-pile was near the Collins and Glennville Railroad, about four hundred yards from the Gore House. Tracks of an automobile were found at that place, as were also certain human tracks that led in the direction of the house. Previously George Newton, son of defendant Homer Newton, had been killed. Flanders had been tried in October for murder of young Newton. Lawton Powell testified, that, just after the hearing of Flanders for shooting Homer Newton's boy, Newton called the witness Powell out of the store, and "commenced cursing me and telling me what they had done to his boy, about Fred murdering his boy, and he said he knowed damn well that he didn't have but a little while to live, and he was going to have revenge out of Fred and out of me; and he said there was one more, but he didn't mention the name." Bruce Murphy testified, that, between the time of the preliminary hearing and the regular trial of Flanders for the murder of the boy, "I was at the river fishing with Homer Newton, and he said that Fed took the picture from his heart, that he killed the only boy he had, and that if somebody would kill Fed he would pay him for it. The conversation was a long time before Mr. Flanders was killed." W. E. Chappel testified: "I am a Methodist minister, and during the middle and latter part of 1940 I lived in Collins. After Mr. Newton's son was killed I visited in the home some, and one day Mr. Newton said that if he didn't get justice from the court he would take justice, or get justice; he was talking about Mr. Flanders." J. K. Hill testified: "One night after Mr. Flanders *Page 142 
had shot Mr. Newton's son George, he (Newton) came to my house, and I went out to the car, and he accused my wife and Mrs. George Jarriel and Fed Flanders of being the murderers of his son. He said that Mr. Flanders was a low-down type of man and been around and burned houses and all such things. He said that they were murderers of his son, and that he was going to get revenge. . . I wouldn't say that my wife and Mrs. Jarriel insisted on Fed arresting George Turner, but they spoke to him about it."
George Turner as a witness for the State testified that he had previously made statements that were contradictory to certain portions of the testimony that he was giving; but in part he testified substantially, that Homer Newton "spoke of Fed Flanders on one or two occasions, and said something about wanting to get Fed, or wanting to see Fed's blood up to his elbows;" that sometime in November Newton told witness to see Elton Purcell and Sammy Mann and find out if they would kill Flanders for a thousand dollars; that about half past four o'clock in the morning of the homicide Newton came to the witness's room and said to go with him. "We first went to Mills' house, and Mills came to the window, and I asked him did he want to go hunting, and he said he would, and he come and got in the car. About the time Mills got in the car . . Newton asked me would I have the guts to kill Fed [Flanders]. I answered that if I had anything against him I might have. I don't remember just what Mills said, but it was something like `we ought to get him' or `ought to get them.' . . We came back through Collins and parked out there . . out towards the old railroad, Collins and Glennville Railroad, and turned around, and [Newton] stopped the car. . . Mills had a shotgun with him. . . Where the car was stopped was four or five hundred yards from the home of . . Flanders, and Mills and [Newton] walked up the railroad in that direction. I stayed in the car. . . I had instructions that if any one came up I was to blow the horn and pull out of there. . . Newton gave me those instructions. Quite a while after they had gone I heard a gun fire up towards town; . . kinda in the direction where . . Flanders lived. . . Soon . . [Newton] came down the railroad and got in the car, and we . . went back to [Newton's] house. . . We changed shoes when we first pulled out there at the railroad. . . That was before he went in the direction *Page 143 
of Flanders' house. When he came back to the car he had the shoes in his hand, and he got in and we pulled in back of widow Harvey's house. . . [Newton] stepped out and said `Give me my shoes and get rid of these, and take the rifle out and go back to Dessie's and pick up Mills and go hunting.' . . I went back . . and found [Mills] on the old Reidsville road. He had his shotgun with him, and when he got in the car he said, `There is a car pulling in back of us, and you had better step on it and get out of here.' . . He said he felt all right about it now that we got out of town, . . and he asked me did I reckon small shot would take the buckshot sign out of a gun, . . and he shot it out the window, and I threw the shell out. . . We finally decided to go to Purcell's house; and I woke him up. . . He came out to the car, and I told him something had happened in Collins that morning and if anybody asked him about it . . to tell them that we got there about an hour earlier than we did. We took him by his daddy's to get a gun, and then . . went out in the swamp. Somebody . . said it would be a pretty good alibi if we could carry some squirrels back. . . We stayed down there about an hour and a half, and when we started to leave we left a pair of my shoes with Purcell — the ones [Newton] had told me to hide, a pair of overalls, a piece of black cloth about the size of a flour-sack, and a 30-30 rifle. I didn't know anything about the black cloth until Mills got it out of the foot of the car and told Elton to take it, too, and get rid of it. Mills wanted to swap shotguns with Elton, but Elton said that he and his father owned the gun together, and so Mills told him to keep his (Mills') gun for a few days. . . When we started to leave Elton's place Elton said, `You boys know how to keep your mouth shut, don't you?' . . and Mills said, `I will die with it in me.'"
Elton Purcell, testified: "I didn't know Theodore Mills until . . he came to my home with George Turner, on Tuesday, December 31st. They got there just before daylight, and Turner called me and told me that a man had happened to some trouble, and for us to go down to the swamp. On the way to the swamp one of them said they wanted to kill some squirrels. I took them to the best place I knew to kill squirrels. . . I suggested that we build a fire and warm, and we sat by it and talked for something like an hour. George told me that he wanted to trade shoes *Page 144 
with me, and we exchanged shoes there. We called Mills and started back to the car and met him about half way to the car. Mills had killed one squirrel. Turner didn't have a gun. Mills said he would trade guns with me, but I didn't want to trade, so he said that he would give me his gun, or let me keep it a while. I didn't look at it very closely, but it appeared to be a double-barrel hammerless sixteen-gauge shotgun. When we got back to the house Turner told me that he wanted a pair of my trousers, and we got out and started to go in the house, and he said, `You take these overalls and shoes and destroy them,' and I got out of the car, and George handed them to me, and Mills reached under the front seat or in the front somewhere and handed me a black piece of cloth and said, `Take this and destroy it too.' George took a thirty-thirty Winchester rifle out of the car and gave it to me to keep for him. I said, `Boys you got me in on this, now be damn sure you don't let it out no where.' George shook hands, and Mills said, `I will die with it in me.'"
H. H. (Homer) Newton, sworn for the defendant, testified: "I am indicted, together with George Turner and Theodore Mills. George Turner is my nephew, and has lived in my home as one of my family since 1927. Turner used my car at any time he wanted to. He runs a filling-station, and he always leaves home around six o'clock to go to the station, and often he would drive my car up there. . . The afternoon before, Turner spoke to me for my car for him and Theodore Mills to go hunting, and I didn't see Turner any more until he brought my car back the next morning. I never have said anything to him about getting some one to kill Fed Flanders. I never knew Elton Purcell. The night George Turner was locked up on December 31st, I went to Elton's home. . . Elton did not say anything about any statement about destroying anything, and he did not say anything about my rifle being there. He didn't mention anything about an old black rag, or overalls, or shoes, or rifle, that was to be destroyed. I went there solely in George's behalf. . . I had been keeping the rifle in the trunk of my car; it stayed there. I did not give George permission to use that rifle and take it off and destroy it. I know nothing at all about any shoes or overalls or rag or guns being destroyed. I did not send anything by George to Elton to be destroyed. I had nothing to do with George's going to Elton's that morning, and I had *Page 145 
nothing whatever to do with the death of Fed Flanders. I had never told Bruce Murphy that I would pay anybody to kill him, and I never told any one else that. I never said anything to George about hiring Sammy Mann to kill him. As I went out on my regular mail route that morning I drove by Theodore's [Mills'] house, and he was standing in the window, and I asked him did he want to go bird-hunting that afternoon, and he said yes. . . Mills lives about a hundred yards off my regular route. I wanted to see him about hunting that morning, because he owned the dog, and I was afraid he might not be at home that afternoon if he wasn't expecting me. . . The sheriff was at Mills' house when I drove by there. . . I never made any threats against Fed Flanders to any one; and if I ever told any one I was going to get revenge out of Flanders, I don't remember it. I did not tell Bruce Murphy that I would pay anybody to kill Flanders. I never talked with any one about hiring anybody to kill Flanders. That rifle is not mine. I borrowed it from Eddie Lane, and kept it locked up in the trunk of my car, for my own protection. . . Rev. Chappel came to my house two or three times after my boy was murdered, and talked with my wife and me, but I don't remember what was said. I did not tell him. though, that if I didn't get justice in the court I would take it into my own hands and get justice. I never made a statement that I wanted to see Fed's blood up to his elbows; not to any one. I told Mr. Powell that I thought he and the town council were doing me wrong by taking up for the man who murdered my son, but I didn't say anything in a mad malicious way. I never did talk with Mr. Hill and make threats against him and his wife or his wife and Fed Flanders, and I never threatened anything against Mrs. George Jarriel. I didn't know what kind of shoes George had until the sheriff brought them to the prison farm a few days ago, and asked me to try them on. I put on the left one; it was pretty tight, and I don't think I could wear them, but I did put it on. There is not one word of truth about me going in the car to the old slab-pile and getting out of the car, or about my having had anything to do with any part of the whole story. I was arrested on the first of January and carried to Lyons and then carried to the prison farm about the third of January. When I got over there they took me in a room and had George there and an affidavit which they said that he had *Page 146 
signed, connecting me with this crime. George wouldn't [talk?] much, but I told him if he knew anything about it he ought to tell the truth and not tell that story on me; and he said he had told the truth. . . I did not ask Elton Purcell if they left some things there, and he did not tell me that they had left anything there. I deny all those statements about my telling Elton to burn those things and hide the rifle, and that he would get plenty of money out of it, etc. I told Elton that we were going to ask for a hearing, and I meant to summons him and his mother."
The defendant introduced a number of other witnesses who gave testimony tending to show that Newton was at his own home during the whole of the night and until after the time of the homicide, and tending to contradict parts of the testimony of the witnesses for the State, and to show the good character of the defendant Mills, and tending to discredit the theory that Flanders was killed by the defendant or as a result of a conspiracy in which the defendant Mills was involved. In Mills' statement before the jury he denied that he was at the depot in Collins before day, as testified by the State's witness Flanders. He further stated: "I haven't been to Collins before daylight since I quit working at the plant, and when I worked there I worked all hours of the night and had to go back and to work at all hours of the night, and that is the last time I have been in Collins before day. Far as me talking to Homer Newton at the post-office, that is true. I talked with him whenever I wanted to see him on any business or anything else, talked with him wherever I found him; several times I went to the post-office and got in his car and talked with him, and sometimes I went to his house, and sometimes he went to my house and got the gun and dog to go hunting. Far as those guns with Purcell, that is true. I offered to trade with him. I had a sixteen-gauge double-barrel hammerless shotgun, and he had an old single-barrel; and I told Purcell if he had the difference I would swap with him, and he said, `Well, this gun is not mine; it belongs [to] my father,' and I said then, `If that is the case you can't trade it,' and I didn't say any more about it. Far as the black cloth and rifle and changing clothes, that is something I don't have any knowledge of. Whenever we got to the swamp Turner and Purcell left me, and I don't know where they went or what they did, whether they come back to the car or not. I went in the swamp *Page 147 
hunting, and that was a little before day, and I was going in the swamp looking for squirrel beds. I didn't see any when I first left the car, and I kept easing on in the swamp. . . The reason I went with Turner this special morning, I talked to him the evening before, and he asked me to go and I said no, I couldn't go in the morning, and I didn't think any more about it. I got in a wagon with a neighbor and went home. Anyway next morning he come and asked would I go, and said, `I got to go to Savannah to-morrow, and thought I would come and see if you couldn't put off your work to-day and go with me,' and I said I guess I could, and we got in the car and went on hunting. Nothing [was] said about no crime being committed in my presence. . . The first I knew of any crime the sheriff come to my house telling me about it; and while the sheriff was there Homer Newton came by and asked me did I want to go hunting that evening, and I said, well, I guess I couldn't, and as he went backing out the lane he said, `Well I will see you after while,' and that is all he said. That's all the conversation I had with him. . . Far as any crime, I had no knowledge of any crime. . . I am as innocent of any crime as any man in this house. There was nobody in that car when he come to my house but him. . . Far as sticking the gun out the window and shooting it, I did not do that. I shot my gun one time that morning, and killed a squirrel; that is the only time it was shot that I know anything about, and I had it in my hands from the time I left until I got home. I turned the gun over to Vernon Moore and Leland Kennedy."
1. The first and fifth special grounds of the motion for a new trial, relating to alleged newly discovered evidence, failed to show that by ordinary diligence the evidence could not have been discovered before verdict, or that it was of such character as would probably produce a different result on another trial. Code, §§ 70-204, 70-205. It will not suffice to allege merely that the evidence could not have been discovered by ordinary diligence. Douberly v.State, 184 Ga. 573 (7) (192 S.E. 223), and cit. *Page 148 
2. A conspiracy may be shown by circumstantial as well as direct evidence. McLeroy v. State, 125 Ga. 240 (2) (54 S.E. 125); Weaver v. State, 135 Ga. 317 (69 S.E. 488);Mack v. State, 185 Ga. 415, 416 (195 S.E. 179).
3. "An accomplice is one who is present at the commission of a crime, aiding and abetting the perpetrator, or who could be convicted of the crime as an accessory before the fact." Street
v. State, 179 Ga. 636 (176 S.E. 632); Birdsong v. State,120 Ga. 850 (48 S.E. 329); Baker v. State, 121 Ga. 189
(2) (48 S.E. 967); Lanier v. State, 187 Ga. 534, 541 (1 S.E.2d 405).
(a) The evidence was sufficient to show that the witness George Turner was an accomplice, on the theory that he participated in the crime as an accessory before the fact.
(b) The evidence did not show that the witness Elton Purcell was an accomplice. If he was an accessory after the fact, that would not suffice to make him an accomplice within the meaning of the Code, § 38-121. Allen v. State, 74 Ga. 769; Springer
v. State, 102 Ga. 447; Kearce v. State, 178 Ga. 220 (3) (172 S.E. 643).
(c) The evidence was sufficient corroboration, within the meaning of the above-cited Code section, of the testimony of the accomplice George Turner.
(d) The evidence, though circumstantial, was sufficient to authorize the judge to give in charge to the jury the law of conspiracy as complained of in the third and fourth special grounds of the motion for a new trial.
4. The court allowed the attorneys for the defendant, on direct examination of a witness introduced by them, to elicit from the witness testimony that the general reputation of the defendant was good, but refused to allow the attorneys to enlarge on the subject by asking the witness, "if he knows how the best people in the community in which he lives treat him, whether they are his neighbors or not, whether he visit with them and they with him, and whether they associate generally together with him on an equality with other good people in the community," to which it was stated that the witness was expected "to answer that he associates with the best people of the community and the best people associate with him, intermingle with him and visit him and he visits them, and they treat him as a man of good character." There was no error, as *Page 149 
complained of in the second special ground of the motion for a new trial, in refusing to allow the question to be answered.
5. Ground 6 of the motion for a new trial complains that Hoyt Sikes, one of the jurors who tried the case, was related within the prohibited degree to W. H. Hodges, who had "contributed money to a fund which was raised for the purpose of employing" an attorney to aid the solicitor-general in the prosecution of the case; that the said attorney was so employed, and did so aid in the prosecution. A part of this ground of the motion was an affidavit by Hodges, deposing that "when a collection was being taken in the City of Collins [where the homicide occurred] to raise funds to pay an attorney to aid in the prosecution of said case, deponent donated the sum of fifty cents." There was no other evidence as to contribution by Hodges. Held, that the affidavit so made by Hodges as quoted above, in failing as it did to show to whom the sum was paid or the actual use that was made of it, was too general and indefinite to show that the sum was in fact used to employ an attorney, so as to make the attorney who aided in the prosecution the representative of deponent, and thus render deponent a volunteer prosecutor. The affidavit is merely opinionative and hearsay as to the purpose for which the "collection was being taken." In such case it is not enough to show interest by such person, but it must appear as a matter of fact that the person became a volunteer prosecutor by use of his contribution to employ an attorney. Unless there was such use, the attorney would not become the agent or representative of the person, so as to render the latter a volunteer prosecutor. The present case differs from Lyens v. State, 133 Ga. 587 (4) (66 S.E. 792), in which it was conceded in open court that the money representing the contribution was actually paid by the contributor and was used in part to pay the fee of the attorney employed to prosecute the case. The question there was as to the legal disqualification of a juror who was related to such contributor, the contribution and employment both being conceded.
6. The evidence was sufficient to support the verdict, and there was no error in refusing a new trial.
Judgment affirmed. All the Justices concur. *Page 150