300 Ga. 694
FINAL COPY

S16A1674. BOLLING v. THE STATE.

PETERSON, Justice.

Following a jury trial, Eric Lamont Bolling was convicted of the murder of Parviz Moledina, as well as burglary in the first degree and possession of a knife during the commission of a felony.[1] Bolling appeals and argues that (1) the evidence was insufficient to sustain his convictions, (2) the trial court erred in allowing the State to introduce into evidence prior trial testimony of a co-defendant, and (3) the trial court erred in allowing the State to play the co-defendant's videotaped police interview to the jury. We affirm because the

[1] The crimes occurred in November 2012. On February 20, 2013, a Gwinnett County grand jury indicted Bolling for malice murder, two counts of felony murder, three counts of burglary in the first degree, aggravated assault, and possession of a knife during the commission of a felony. Two of the burglary counts were severed for trial and then nolle prossed after trial on the other counts. A trial that took place in August 2014 resulted in a hung jury, and Bolling was retried in June 2015. The jury found Bolling guilty of all charges. He was sentenced to life in prison for malice murder, a consecutive 20-year term of imprisonment for burglary, and a consecutive five-year term of imprisonment for possession of a knife during the commission of a felony. The sentencing court vacated the two felony murder counts, and merged the aggravated assault count with the malice murder conviction. On July 17, 2015, Bolling filed a motion for new trial, which he amended with new counsel on February 17, 2016. After a hearing, the trial court denied the motion on February 26, 2016. Bolling filed a timely notice of appeal, and the case was docketed to this Court for the September 2016 term and submitted for a decision on the briefs.

evidence was sufficient to sustain Bolling's convictions, and admission of the prior trial testimony and the video statement was not an abuse of discretion because the witness was unavailable and the State made a reasonable effort to locate him, and the video statement was made prior to the witness's alleged motive to lie.

Viewed in the light most favorable to the verdict, the trial evidence showed the following:

*Investigation*

On November 21, 2012, Moledina's neighbors returned from a Thanksgiving trip and noticed that Moledina's garage door was open, her car was gone, and there was a hole in the roof where the attic vent had been displaced. One neighbor rang the doorbell at Moledina's house. After Moledina did not answer, the neighbor peered through the bedroom blinds and saw that the room was in disarray, with Moledina motionless on the ground. Neighbors called the police, who found Moledina dead and lying in a pool of her own blood. Moledina had been stabbed 33 times, she had many defensive wounds, and one of her fingers had been completely severed from her hand.

Searching the house, police found multiple blood spatter patterns, a torn

2

money wrapper with "$5,000" written on it, and a knife blade separated from its handle. Police officers issued a be on the lookout for Moledina's 2009 Volvo, which was found at a shopping mall in Gwinnett County. Fingerprints matching Bolling were found throughout Moledina's house and vehicle. Police also found a Metro PCS bag inside Moledina's Volvo, and the bag contained a receipt for a November 21, 2012, purchase listing Bolling's name and address. Police searched Bolling's residence, located on the same street as Moledina's home, and found a key to Moledina's house, Moledina's computer, $1,500 in cash, two prescription bottles containing hydrocodone and bearing Moledina's name, and a sock and a pair of jeans covered with blood that matched Moledina's DNA. According to a Georgia Bureau of Investigation (GBI) expert who testified at trial, the blood spatter pattern on the jeans indicated that some of the stains were made at the time the blood went airborne.

Another Metro PCS receipt was found in Bolling's room with the name and address of Justin Eldridge, whose fingerprints also were found on Moledina's car. Eldridge and Bolling were arrested, and Eldridge gave a videotaped statement to police upon his arrest. That said, Eldridge was charged with multiple crimes in connection with his involvement in and concealment of

3

the offenses, and he pleaded guilty under the First Offender Act, OCGA § 42-8-60, to one count of theft by receiving stolen property.

*Trial*

As part of his plea deal, Eldridge testified against Bolling at Bolling's first trial. After Eldridge testified, the State moved to admit Eldridge's videotaped statement to police, arguing that Bolling had alleged that Eldridge had an improper motive for testifying against him. The trial court granted the State's motion, and portions of the police interview were played to the jury. Bolling's first trial resulted in a hung jury.

A few weeks prior to Bolling's second trial, a State investigator attempted to locate Eldridge to secure his attendance as a witness, but was unable to find him. The investigator testified that she contacted Eldridge's probation officer, who gave her an address for Eldridge and informed her that Eldridge had missed his last probation appointment. The investigator visited the address about two weeks before trial and learned that Eldridge had moved. The investigator then visited another address listed on Eldridge's Georgia identification card. Eldridge's ex-girlfriend lived at that residence and informed the investigator that Eldridge no longer lived there. A neighbor informed the investigator that he

4

believed Eldridge had moved back to Baltimore. The investigator conducted further research and discovered contact information for Eldridge's mother, grandmother, and siblings who lived in Baltimore. The investigator left messages with these relatives. Eldridge's grandmother responded that she had not seen Eldridge and was not in current contact with Eldridge's mother. An Internet search showed that Eldridge had recently lived at an address that matched his mother's address, but the mother did not respond to the investigator's letter or voicemail. The State moved to admit Eldridge's prior testimony under OCGA § 24-8-804, and the trial court granted the motion over Bolling's objection.

In the testimony read to the jury at the second trial, Eldridge stated that Bolling had contacted him on Facebook around 4:00 a.m. one day in November 2012, asked to hang out, and stated that he had a "whip," referring to a car. Eldridge asked what kind of car Bolling had, and Bolling replied that it was a Volvo. In that Facebook conversation, Bolling told Eldridge that he would give Eldridge some hydrocodone pills, and that he was "going to throw stacks" (a large amount of money) at a woman who had been asking about Bolling. After their Facebook conversation, Bolling picked up Eldridge in the Volvo, and the

5

pair went shopping. When Eldridge asked how Bolling got the money and the car, Bolling responded, "It's a lick I hit," meaning that he robbed someone. Bolling also told Eldridge that he had stabbed someone. At some point, Eldridge began driving the Volvo. Fearing he was being pursued by a police officer, Eldridge left the car at a shopping mall, where it was later found by police.

As in the first trial, the trial court allowed the State to play Eldridge's videotaped police interview for the jury in order to rebut allegations of improper motive. Bolling was convicted of all charges following the second trial. This appeal follows.

1. Bolling argues that the evidence was insufficient to sustain his convictions for malice murder and possession of a knife during the commission of a felony.[2] We disagree.

Bolling testified at trial that he entered Moledina's house to steal some items after he saw that it already had been burglarized, realized Moledina was

---

[2] Bolling also argues that the evidence was insufficient to sustain his convictions on two counts of felony murder and one count of aggravated assault, but these arguments are moot because the trial court vacated the felony murder counts and merged the aggravated assault count into the malice murder count for purposes of sentencing. See Lupoe v. State, 284 Ga. 576, 577 (1) n.2 (669 SE2d 133) (2008). In reviewing Bolling's argument, we consider only the evidence introduced at his second trial.

dead when he knelt down next to her body, and took several things ($5,000, computers, and prescription bottles) before leaving in Moledina's Volvo.

Bolling argues that the only evidence linking him to Moledina's murder was Eldridge's testimony, and Eldridge's testimony could not support the conviction because he was not an eyewitness, he had a motive to lie, and his testimony — though that of an accomplice — was not corroborated. Bolling's arguments fail.

To sustain a felony conviction, the testimony of an accomplice must be corroborated.[3]  See OCGA § 24-14-8.  We have explained that

> sufficient corroborating evidence may be circumstantial, it may be slight, and it need not of itself be sufficient to warrant a conviction of the crime charged. It must, however, be independent of the accomplice testimony and must directly connect the defendant with the crime, or lead to the inference that he is guilty.

Bradshaw v. State, 296 Ga. 650, 654-655 (2) (769 SE2d 892) (2015) (citation omitted). The corroborating evidence here easily clears this low bar.

In addition to the evidence placing Bolling inside Moledina's house,

---

[3] The evidence shows that Eldridge was not involved in the murder.  See Mills v. State, 193 Ga. 139, 148 (3) (17 SE2d 719) (1941) (explaining that an "accomplice" is one who is present at the commission of the crime, aiding and abetting the perpetrator, or who could be convicted of such crime as an accessory before the fact). But even if the corroboration requirement applied to Eldridge's testimony about the murder, that requirement has been met here.

including Bolling's own trial testimony, there was physical evidence showing that he murdered her by stabbing her with a knife. At Bolling's residence, police found a sock and a pair of jeans that contained blood matching Moledina's DNA. A GBI expert testified that the blood spatter pattern on Bolling's jeans was made at the time the blood went airborne, i.e., when Moledina was stabbed. This evidence sufficiently corroborated Eldridge's trial testimony that Bolling told him that he stabbed someone during the burglary. As a result, the evidence was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Bolling was guilty of the crimes for which he was convicted. Jackson v. Virginia, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Bolling argues that the trial court erred in admitting Eldridge's prior trial testimony under OCGA § 24-8-804. We disagree.

We review the trial court's decision to admit evidence for an abuse of discretion. See Reed v. State, 291 Ga. 10, 14 (3) (727 SE2d 112) (2012). OCGA § 24-8-804 (b) (1) ("Rule 804 (b) (1)") provides in relevant part:

> The following shall not be excluded by the hearsay rule if the declarant is unavailable as a witness: (1) Testimony given as a witness at another hearing of the same or a different proceeding, . . . if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct,

8

cross, or redirect examination. . . .

The term "unavailable as a witness" includes a situation in which the declarant is "absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance . . . by process or other reasonable means." OCGA § 24-8-804 (a) (5) ("Rule 804 (a) (5)"). OCGA § 24-8-804 is the counterpart to Rule 804 of the Federal Rules of Evidence. When we consider the meaning of Rule 804, we may consider the decisions of federal appellate courts, particularly the decisions of the United States Supreme Court and the Eleventh Circuit, construing and applying our rule's federal counterpart.[4] See Olds v. State, 299 Ga. 65, 69 (2) (786 SE2d 633) (2016).

(a) Bolling argues that Eldridge was not an "unavailable witness", because

---

[4] As we have previously noted, although the Federal Rules of Evidence were amended effective December 2011, after our new Evidence Code was signed into law in May 2011, the changes "were intended to be stylistic only, with no intent to change the result in any ruling on the admissibility of evidence." Parker v. State, 296 Ga. 586, 592 (3) (a) n.10 (769 SE2d 329) (2015). Federal Rule 804 now provides that a declarant is unavailable if he "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance, in the case of a hearsay exception under Rule 804 (b) (1)[.]" Fed.R.Evid. 804 (a) (5) (A). Federal Rule 804 (b) (1) provides that an unavailable declarant's statements are not to be excluded as hearsay if they are part of testimony "given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Fed.R.Evid. 804 (b) (1).

the State did not show that it was unable to procure Eldridge's attendance.

To establish that a witness is unavailable under Rule 804 (a) (5), the proponent must show that reasonable, good-faith efforts to locate the witness were made. See United States v. Siddiqui, 235 F.3d 1318, 1324 (II) (D) (11th Cir. 2000) ("The lengths to which the government must go to produce a witness is a matter of reasonableness.").

Bolling acknowledges the State's substantial efforts in attempting to locate Eldridge, as evidenced by the investigator's testimony, and we are unpersuaded by his assertion that the State's substantial efforts were nevertheless unreasonable because Eldridge's testimony was very important to the State's case.[5] The evidence showed that the investigator exhausted all efforts to find Eldridge in Georgia. Eldridge may have been living somewhere in Maryland, but the investigator's efforts to find him were unsuccessful. Bolling's claim that the State would have located Eldridge if the search had begun sooner is mere speculation, and he does not set forth what other

---

[5] Bolling suggests that Eldridge provided the only evidence linking him to the murder. That claim is without merit, as other evidence showed that the blood spatter found on Bolling's jeans matched Moledina's DNA and was transferred to Bolling's jeans during the stabbing of Moledina.

10

reasonable efforts the State should have made to locate Eldridge. Under these circumstances, the trial court did not abuse its discretion in admitting Eldridge's prior trial testimony after concluding that the State made a reasonable effort to locate him. See, e.g., United States v. Samaniego, 345 F.3d 1280, 1283-1284 (11th Cir. 2003) (concluding that defendant made reasonable efforts under Rule 804 (a) (5) where the witness was a foreign national whose attendance could not be procured by process and the defendant enlisted the help of the witness's family in attempting to locate him and persuade him to testify); United States v. Flenoid, 949 F.2d 970, 972-973 (II) (8th Cir. 1991) (concluding that witness was "unavailable" because proponent directed marshals to serve the witness at the last known address, made other attempts to reach the witness at that address, and exhausted all other leads concerning her whereabouts).

(b)   Bolling also argues that the prior testimony should have been excluded because he was not given an opportunity to explore fully Eldridge's motive and benefit for testifying against him since Eldridge had not been sentenced at the time of the first trial, and this lack of opportunity deprived him of his Sixth Amendment confrontation rights.

Pretermitting whether Bolling preserved this argument for appeal, he

11

cannot establish that the admission of Eldridge's testimony was error. Regardless of whether Eldridge actually had been sentenced at the time of the first trial, Bolling was given sufficient opportunity to explore Eldridge's motive and benefit for testifying against him, as he elicited testimony that Eldridge faced a maximum sentence of 20 years' imprisonment on his charges and, pursuant to his plea deal, was receiving a sentence of probation only.

3. Finally, Bolling argues that the trial court erred in allowing the State to introduce Eldridge's videotaped statement concerning Bolling's confession to him. Bolling argues that his general attack on Eldridge's veracity during cross-examination did not permit the State to rehabilitate Eldridge's credibility with a prior consistent statement. We disagree.

At the first trial, Bolling cross-examined Eldridge about his pending criminal charges, on which he faced up to 20 years' imprisonment, and the State's plea offer. Bolling asked Eldridge:

> Q: So before making your plea deal with the State[,] you were facing 20 years that could have been served in prison, is that correct?
> A: Yes, sir.
>
> Q: And in return for your testimony today you're getting time served and straight probation?

12

A: Yes, sir.

Bolling also elicited testimony that Eldridge first lied to police about not knowing about the crime and not having any contact with Bolling after the murder, and that he told police that he did not believe Bolling when Bolling said he stabbed a woman. The State moved to publish Eldridge's videotaped statement made to police before any plea negotiations, arguing that Bolling had suggested that Eldridge fabricated his testimony or had an improper motive for testifying against him (to receive the benefit of the plea deal) and the videotape would rebut that allegation. The trial court granted the State's request over Bolling's objection, and based on the court's evidentiary decision at the first trial, the State played the video at the second trial.

A witness's prior consistent statement is "admissible to rehabilitate a witness if the prior consistent statement logically rebuts an attack made on the witness's credibility[,]" OCGA § 24-6-613 (c)), and the witness testifies at the trial and is subject to cross-examination, OCGA § 24-8-801 (d) (1) (A). A prior consistent statement is not permitted to rehabilitate a general attack on a witness's credibility, but may be "offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive" if the

13

statement was "made before the alleged recent fabrication or improper influence or motive arose." OCGA § 24-6-613 (c)); see also Duggan v. State, 285 Ga. 363, 366 (2) (677 SE2d 92) (2009) ("[T]o be admissible to refute the allegation of recent fabrication, improper influence, or improper motive, the prior statement must predate the alleged fabrication, influence, or motive.") (quoting Tome v. United States, 513 U.S. 150, 158 (115 SCt 696, 130 LE2d 574) (1995)) (punctuation omitted).

Eldridge's videotaped statement satisfies this standard. Eldridge was present and available for cross-examination at the first trial. Contrary to Bolling's argument, he implicitly argued that Eldridge had a motive to lie. By asking Eldridge about agreeing to testify as part of his plea deal in order to avoid facing 20 years in prison, Bolling was clearly suggesting that Eldridge's motivation for testifying was to receive the benefit of the State's plea offer. See Mosley v. State, 298 Ga. 849, 851-852 (2) (a) (785 SE2d 297) (2016) (testimony regarding what witness said to a friend would have been admissible as a prior consistent statement where defendant challenged witness's credibility at trial by "suggesting that [the witness] fabricated [his] testimony only after the State gave him a favorable plea offer"). Eldridge's videotaped statements predated the

14

alleged improper motive, as he gave the statements before the State made the plea offer. Therefore, the trial court did not err in admitting the videotaped statement.

Judgment affirmed. All the Justices concur.


Decided March 6, 2017.

Murder. Gwinnett Superior Court. Before Judge Turner.

Juwayn Haddad, for appellant.

Daniel J. Porter, District Attorney, Christopher M. Quinn, Jon W. Setzer, Assistant District Attorneys; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General, for appellee.