303 Ga. 597
FINAL COPY

S18A0121. DORSEY v. THE STATE.

PETERSON, Justice.

Shakeim Malcom Dorsey appeals his convictions for malice murder and possession of a firearm during the commission of a felony in connection with the shooting death of Derickes Miles.[1] Dorsey argues (1) that the evidence was insufficient to support his convictions, and that the trial court (2) erroneously allowed the medical examiner to testify about matters outside his area of knowledge and (3) erroneously admitted a witness's prior consistent statements. We affirm because the evidence was sufficient to support Dorsey's convictions,

---

[1] Miles was killed on April 19, 2013. On December 23, 2014, a Muscogee County grand jury indicted Dorsey for malice murder, felony murder predicated on aggravated assault, two counts of aggravated assault, and possession of a firearm during the commission of a felony. Following a jury trial held from June 29 to July 2, 2015, the jury found Dorsey guilty of all charges except one of the aggravated assault charges. The trial court sentenced Dorsey to life imprisonment for malice murder and a consecutive five-year term for the firearm offense; the felony murder verdict was vacated by operation of law, and the aggravated assault verdict was merged for sentencing purposes. On May 15, 2017, the trial court denied Dorsey's motion for new trial, as amended. Dorsey filed a timely notice of appeal, and his case was docketed to this Court's term beginning in December 2017 and submitted for a decision on the briefs.

Dorsey invited any error regarding the medical examiner's testimony, and the witness's prior consistent statements became admissible after Dorsey suggested that the witness had fabricated his testimony.

Viewed in the light most favorable to the jury verdicts, the trial evidence showed the following. On the morning of April 19, 2013, Dorsey and his girlfriend, Iesha Wiggins, had an argument in their apartment. David Wiggins, Iesha's cousin, was also there, and Lashonda Jackson, Iesha's friend, was outside the apartment. David tried to intervene on his cousin's behalf, but Dorsey hit him and a fight ensued. When David let Dorsey get up off the floor, Dorsey ran into a room and grabbed a black revolver. David reasoned with Dorsey, and the men shook hands. David left the apartment complex with Jackson; as he was leaving, David heard Dorsey resume yelling at Iesha and saw Dorsey hit her.

Soon thereafter, Jackson called members of Iesha's family. Based on this phone call, Iesha's cousins (Alliyah and Delinda Wiggins) and the cousins' boyfriends (Derickes Miles and Lacody Edmonds) became concerned about Iesha's welfare and walked to Iesha's apartment to check on her. Alliyah and

2

Delinda testified that no one in the group had a weapon and that their brother David was not with them at the time.

Alliyah and Miles were the first to arrive at Iesha's apartment. Alliyah knocked on the door, and Miles announced his presence. Alliyah heard Iesha say, "Don't do it, Malcom. Don't do it." Dorsey then opened the door and pointed a gun at Miles. Alliyah took off running and heard Miles say, "so what [are] you going to do, shoot me?" before seeing him run away as well. Alliyah then saw Dorsey start shooting at Miles. By this time, Delinda and Edmonds were close to the apartment. Delinda saw Alliyah running away with a look of terror on her face and then heard a gunshot; she and Edmonds also fled. As she ran, Delinda saw Dorsey chasing Miles and shooting at him.

An eyewitness testified at trial that he heard two gunshots and immediately stepped outside his business to investigate. He saw a screaming woman running down the street and a man being chased by another man with a gun. The eyewitness retreated inside, saw the two men next to his business, and heard at least three gunshots fired next to his building. The eyewitness testified at trial that he heard a total of six gunshots, with about a one-minute interval between the first two shots and the third, a two-minute interval after the

third shot, and the last three shots fired in quick succession. The eyewitness, who owned several guns, believed that the gunshots were all fired from either a .38 or .32 caliber revolver.

After hearing the last gunshot, the eyewitness heard one of the men moaning and went outside to check on him. The man, later identified as Miles, was in a fetal position and did not have any weapons near him. Miles had been struck by a bullet in the back and died as a result of the gunshot wound.

The medical examiner testified that the bullet entered at the bottom of Miles's rib cage and traveled about five inches through his right lung and the right atrium of his heart. The medical examiner testified that the tip of the bullet had a slight deformity that was consistent with hitting one of Miles's ribs. The medical examiner opined that the trajectory of the bullet was consistent with Miles being shot in the back while he was bent forward. A firearms examiner testified that the .38 caliber bullet recovered from Miles's body was fired from a revolver.

At trial, Dorsey claimed self-defense. He testified that there was a loud banging on the apartment door following his altercation with David Wiggins. Dorsey answered the door and saw David, Miles, and Edmonds. Dorsey

4

admitted on cross-examination that his .38 revolver was loaded and in his pocket when he answered the door. Dorsey testified that while he was standing in the doorway, Miles said aggressively, "You know what it is," and Edmonds began reaching for a gun in his waistband. Dorsey said that he panicked and fired two shots to protect himself and his family, but never intended to shoot anyone. The three men left, and Dorsey followed to see where they had gone. When he did not see anyone, he went back inside the apartment to grab some money and then fled the scene for fear that the men would return and retaliate.

1. Dorsey argues that the evidence was insufficient to sustain his convictions because the State's witnesses gave conflicting testimony about how many shots Dorsey fired and where he fired them from, and the conflicting testimony was not resolved by the physical evidence. He also argues that no witness could eliminate the possibility of a ricochet striking the victim and moving upward through the victim's body, and because Dorsey had no reason to kill Miles, the evidence was more consistent with Dorsey's claim that he shot Miles in self-defense or, in the alternative, that he was guilty of voluntary manslaughter.

When we consider the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and inquire only whether any rational trier of fact might find beyond a reasonable doubt that the defendant is guilty of the crimes of which he was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); White v. State, 293 Ga. 523, 523 (1) (753 SE2d 115) (2013). Under this review, we must "put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." White, 293 Ga. at 523 (1).

Under this standard, the evidence was sufficient to support Dorsey's convictions. Although Dorsey claimed that he was provoked into shooting at Miles because Miles was with men who were threatening him, Alliyah testified that (1) no one but Miles was with her when she knocked on the apartment door, (2) Miles was unarmed, and (3) Dorsey pointed a gun at Miles immediately upon answering the door. Alliyah also testified that when Miles fled, Dorsey chased him and shot at him. Other witnesses corroborated Alliyah's testimony. A business owner testified that six shots were fired from either a .32 or .38 caliber revolver, with the last three shots fired in quick succession next to the

6

business owner's store, which belied Dorsey's claim that he fired only two shots from his .38 caliber revolver while standing outside of his apartment door. Given this evidence, the jury was authorized to reject Dorsey's claim that he was provoked into shooting Miles or that he fired in self-defense. See Fairclough v. State, 276 Ga. 602, 603-604 (2) (581 SE2d 3) (2003) (evidence sufficient to support malice murder conviction notwithstanding defendant's arguments that eyewitness testimony was insufficient to identify him as the shooter and there were inconsistencies as to the type of bullet that inflicted the fatal wound); Roper v. State, 281 Ga. 878, 880 (1) (644 SE2d 120) (2007) (witness credibility is for jury to decide, as is the question of justification; therefore, jury is free to reject claim that defendant acted in self-defense).

2. Dorsey argues that the trial court erred in allowing the medical examiner's testimony that the condition of the bullet recovered from Miles's body was inconsistent with a ricochet off concrete or asphalt; Dorsey claims that the medical examiner's opinion was outside his area of expertise. Dorsey complains about the following.

> STATE: Do you have an opinion based on your autopsy and the state of the bullet as to whether that is consistent with ricocheting off of concrete or asphalt?

7

MEDICAL EXAMINER: I don't believe it's consistent with that. The bullets that I've seen that have hit concrete or asphalt and ricocheted and have gone up into a body have had essentially one entire side sheared off. Because it needs to come down and then as it hits the ground it's going to continue shearing until it comes off the ground.
STATE: No further questions.

Dorsey objected to the testimony, but the testimony was elicited by the State only after the medical examiner testified without objection about a variety of other ballistics-related topics, including stippling and bullet trajectories. Moreover, the objected-to testimony also came after the medical examiner had already answered Dorsey's questions about whether the bullet found in Miles could have been the result of a ricochet:

DORSEY: Now, the — when you mentioned on direct examination about someone bending over and trajectory, that's not — that's a possible way. Now, could the — another possibility — well, let me — let me show you what is marked as State's Exhibit 25. When you removed the bullet, I mean it's not in pristine condition, correct? It's in — it has the defect in it, correct?
MEDICAL EXAMINER: Yeah, at the tip of the bullet there is a little defect in it.
DORSEY: But also it's possible — isn't it true that over your gunshot wounds it's possible you've seen cases where a bullet was fired, it may have hit something whatever that something is, and then hit a person? There was — the bullet may not travel in a straight line for example, you've seen those type of wounds, correct?

MEDICAL EXAMINER: Right. So you're talking either what we call a ricochet or what we call an intermediary target.

DORSEY: Correct.

MEDICAL EXAMINER. And it hits something before hitting the body.

DORSEY: Correct.

MEDICAL EXAMINER: I have —

DORSEY: If I were messing around with a gun or something and I happened to shoot it on the floor or something it could possibly come back and ricochet and hit me in the leg or something to that effect?

MEDICAL EXAMINER: Yeah, what I'll say is usually when I see a ricochet there is more damage to the bullet because it's going to have to really change the trajectory. But I have seen — I've seen a number of cases where there [have] been ricochets or intermediary targets before hitting the body.

When Dorsey attempted to elicit testimony from the medical examiner about a ricochet that would bolster Dorsey's defense that he did not intend to shoot at Miles, Dorsey effectively conceded that the medical examiner was qualified to testify about ricochets and the shape of bullets. And this is so even though the medical examiner did not provide favorable testimony to Dorsey in this respect, as his testimony that "when I see a ricochet there is more damage to the bullet" was essentially an opinion that the shape of the bullet was inconsistent with a ricochet. Because of this, Dorsey can hardly complain about the State's question and the medical examiner's response that was merely a

9

clarification that the bullet probably did not ricochet off concrete or asphalt. See

Adkins v. State, 301 Ga. 153, 156-157 (2) (800 SE2d 341) (2017) (we will not

reverse a conviction based on the admission of evidence that the defendant

introduced himself).

3. Dorsey next argues that the trial court erred in allowing the State to

improperly bolster David Wiggins's testimony with his prior consistent

statements. We disagree.

Prior to trial, David gave a written statement to police and also gave

statements during a videotaped interview. The State did not introduce the

videotape or the written statement into evidence during its direct examination

of David. During cross-examination, Dorsey asked David about his written

statement to the police, suggesting that it was inconsistent with his trial

testimony and that he had omitted details found in his testimony. Dorsey noted,

among other things, that David's written statement said that David was the first

to initiate physical contact with Dorsey when he tried to intervene into the

argument between Dorsey and Iesha. Dorsey also noted that David's written

statement omitted any reference to Dorsey hitting Iesha or that David was at a

friend's house when he heard about the shooting. The State later sought to admit

10

into evidence and play for the jury David's videotaped interview with the lead detective, which was given on the same day that David gave the detective his written statement. The trial court admitted the evidence over Dorsey's objection and the video was played for the jury.

Under the new Evidence Code:

> A prior consistent statement shall be admissible to rehabilitate a witness if the prior consistent statement logically rebuts an attack made on the witness's credibility. A general attack on a witness's credibility with evidence offered under Code Section 24-6-608 [evidence of character and conduct of witness] or 24-6-609 [impeachment by evidence of conviction of a crime] shall not permit rehabilitation under this subsection. If a prior consistent statement is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive, the prior consistent statement shall have been made before the alleged recent fabrication or improper influence or motive arose.

OCGA § 24-6-613 (c); see also OCGA § 24-8-801 (d) (1) (A) (an out-of-court statement is not hearsay if the declarant "testifies at the trial or hearing, is subject to cross-examination concerning the statement, and the statement is admissible as . . . a prior consistent statement under Code Section 24-6-613[.]").

The trial court did not err in admitting David's prior consistent statements. Dorsey attacked David's veracity by suggesting there were inconsistencies

between David's trial testimony and his written statement, and that David fabricated his testimony after giving the written statement.

Dorsey now argues that David's videotaped statement did not predate his alleged motive to lie and suggests that David had a motive to lie to the police prior to giving any statement, written or video-recorded, because David had close connections to the victims and had a lingering animosity toward Dorsey as a result of their altercation. But Dorsey did not make this argument below or even suggest that David's written statement was also the product of a fabrication. Instead, through his cross-examination, Dorsey attempted to portray David as being truthful in his written statement by highlighting evidence that was favorable to Dorsey's defense. Notably, Dorsey pointed out in David's written statement evidence that Dorsey may have acted in self-defense when fighting with David and that David did not say he was at a friend's house during the shooting, all of which supported Dorsey's claim that David was the aggressor and that David returned to the apartment with Miles and Edmonds to seek retaliation. Because the thrust of Dorsey's cross-examination was a charge that David fabricated a different version of events after giving his written statement, the trial court did not err in admitting the videotaped interview. See

Bolling v. State, 300 Ga. 694, 701 (3) (797 SE2d 872) (2017); Mosley v. State, 298 Ga. 849, 853 (2) (c) (785 SE2d 297) (2016).

Judgment affirmed. All the Justices concur.

Decided May 7, 2018.

Murder. Muscogee Superior Court. Before Judge McBride.

Robert G. O'Melveny, for appellant.

Julia F. Slater, District Attorney, Christopher D. Williams, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General, for appellee.