306 Ga. 448
FINAL COPY

S19A0741. ABNEY v. THE STATE.

PETERSON, Justice.

Dwayne Leonard Abney appeals his convictions for multiple counts of malice murder and other crimes related to the shooting deaths of Kiana Marshall, Isaiah Martin, and Alexis Kitchens.[1]

[1] The crimes occurred on October 22, 2015. Two months later, a Chatham County grand jury returned a 43-count indictment against Abney, James Hampton, and Diamond Butler. Abney was charged with conspiracy to commit malice murder (Count 1); three counts of malice murder (Counts 2, 3, 4); six counts of felony murder ☐ two counts per victim predicated on aggravated assault and burglary (Counts 5-10); three counts of aggravated assault (Counts 14, 15, 16); burglary (Count 17); ten counts of possession of a firearm during the commission of a felony (Counts 18-27); fleeing or attempting to elude a police officer (Count 42); and theft by receiving stolen property (Count 43). Following a joint trial with Hampton in December 2017, a jury found Abney guilty of conspiracy to commit malice murder (Count 1), malice murder (Counts 2 and 4), felony murder predicated on aggravated assault (Counts 5-7), aggravated assault (Counts 14-16), possession of a firearm during the commission of a felony (Counts 18-27), and fleeing or attempting to elude a police officer (Count 42); the jury acquitted Abney on the remaining counts and Count 43 was nolle prossed. On December 15, 2017, the trial court sentenced Abney to two consecutive life sentences for the malice murders of Marshall and Kitchens, a concurrent life sentence for the felony murder of Martin, consecutive five-year terms for three firearm counts (Counts 18, 20, 22), a five-year concurrent term on another firearm count (Count 25), and a concurrent five-year term for fleeing or attempting to elude a police officer (Count 42). The remaining counts for which Abney was found guilty (Counts 1, 5, 7, 14-16, 19, 21, 23-24, 26-27) were vacated by operation of law or were merged for sentencing purposes. On December 18, 2017, Abney filed a motion for new trial,

Abney argues that the evidence was insufficient to convict him of fleeing or attempting to elude a police officer. He also argues that the trial court erred in denying his motion for a mistrial when the State elicited testimony that violated the court's ruling on a motion in limine and in overruling his objections to improper bolstering. We affirm because the evidence was sufficient to support his convictions, and the trial court did not err in denying his motion for a mistrial or overruling his objections.

Viewed in the light most favorable to the verdicts, the trial evidence showed that in early October 2015, Marshall allowed Jamaica Bell and Diamond Butler to move in with her in a house she was renting in Savannah. Things did not go well, and Marshall complained about Bell and Butler being messy and inviting guests with guns over to the house. Bell and Butler failed to pay their

which he later amended. On December 3, 2018, the trial court denied Abney's motion for new trial, although it noted in its order that it would revise Abney's sentence to correct a scrivener's error as to Count 18 so that it ran consecutively to Count 2 (instead of Count 5, which was vacated), and to reduce the sentence as to Count 42 because Abney had not been charged with any aggravating circumstances that would make the fleeing offense a felony. Abney filed a timely notice of appeal. His appeal was docketed to this Court's April 2019 term and submitted for a decision on the briefs.

promised share of the rent, so on the morning of October 21, 2015, Marshall asked them to move out. At some point that day, Martin (Marshall's brother) and Kitchens (Marshall's friend) went to the house to make sure Bell and Butler left. Martin told the women to remove their things from the house or Marshall would call the police.

Butler called James Hampton, who arrived sometime later with Abney driving a dark grey Honda Accord. Hampton, Abney, Butler, and Bell left the house in Hampton's car and made a few stops, including at a convenience store around 11:30 p.m. Butler saw that Hampton and Abney both had firearms; Hampton had a 9mm handgun, and Abney had a .380 handgun. After hearing that Marshall was planning to call the police if the women did not remove their belongings from the house that night, Bell and Butler, along with Hampton and Abney, returned to the house and began to pack their things. Bell and Butler could not fit all of their belongings into the trunk of Hampton's car, so they asked Marshall, who had arrived at the house by this point, if they could come back later to retrieve the remaining items. Marshall said no. Hampton, while alone with

3

Butler, asked if she wanted him to "wet that s\*\*t," meaning shoot up the house, and Butler said yes. The group left Marshall's house; Butler thought they were going to return so that she could shoot up the house.

Hampton dropped off Bell and Butler at a friend's house where he had been staying. Butler tried to stay in the car because she wanted to go shoot at Marshall's house, but Hampton insisted that she stay at the house. Hampton and Abney then drove back to Marshall's house, went inside, and shot Martin, Marshall, and Kitchens. The three victims were shot multiple times and died from their injuries. Marshall's neighbors reported hearing multiple gunshots around 12:30 a.m. on October 22, 2015, and one neighbor saw a grey Honda Accord drive away quickly after the shooting.

Hampton and Abney returned to Butler and Bell about 20 minutes after dropping off the women. Hampton told Butler that he had "killed all three of them." Abney, Hampton, Butler, and Bell then smoked marijuana, drank, and listened to music. Bell and Butler left Abney and Hampton that morning.

Butler met Hampton and Abney later that day. While Hampton drove around in a brown Ford Explorer, the group discussed the murders. Hampton again admitted to killing the three victims, and Abney agreed with Hampton's account of the shooting. While in the vehicle, Abney had a .380 handgun; Hampton stated that his 9mm gun was "gone."

Police had already been looking for Hampton and the brown Ford Explorer because Hampton had shot at someone else several weeks earlier while driving the vehicle. When a police officer saw the Ford Explorer, he turned on his police lights and sirens to initiate a traffic stop, but Hampton accelerated. The officer gave chase, and Hampton told Abney and Butler that they could get out and run. Abney agreed, and so when Hampton stopped the Explorer, Abney, Hampton, and Butler fled on foot, running in different directions. The officer apprehended Abney after a short chase, backtracked along Abney's flight path, and recovered a .380 handgun. Hampton was found and arrested the next day.

While searching the murder scene, police recovered eight 9mm shell casings with a "BHA" brand name that were later determined to have been fired from the same gun, a Hi-Point 9mm pistol. The bullets recovered from the three victims were consistent with being fired from a Hi-Point 9mm pistol. During a search of Hampton's residence, police recovered an empty box of BHA 9mm ammunition. Police also found a photo on Hampton's cell phone showing him holding a pistol that could have been a .380 or 9mm Hi-Point.

After their arrests, Abney and Hampton separately made incriminating statements to fellow prisoners. Abney told Eric Washington that he and Hampton went to a house from which a woman had been kicked out and drew their guns. Abney claimed that he never fired his gun and that Hampton killed three people who were inside the house. Hampton similarly told a fellow inmate that he killed the three victims by shooting them with a 9mm Hi-Point pistol. Police also recovered letters Hampton had sent to Abney while in jail in which Hampton had made an apparent attempt to align their version of events.

1. Abney argues that the evidence was insufficient to sustain his conviction for fleeing or attempting to elude a police officer, because he was merely a passenger in Hampton's vehicle and there was no evidence that Abney encouraged Hampton to elude the police officer. We disagree.

Pursuant to OCGA § 40-6-395 (a), it is "unlawful for any driver of a vehicle willfully to fail or refuse to bring his or her vehicle to a stop or otherwise to flee or attempt to elude a pursuing police vehicle or police officer when given a visual or an audible signal to bring the vehicle to a stop[.]" A passenger may be charged and convicted as a party to the crime if he aided and abetted in the commission of the crime, or if he intentionally advised or encouraged the driver to commit the crime. See, e.g., *McNeely v. State*, 296 Ga. 422, 424-425 (1) (768 SE2d 751) (2015); *Westmoreland v. State*, 287 Ga. 688, 693 (4) (b) (699 SE2d 13) (2010); see also OCGA § 16-2-20 (b) (3), (4). Whether a person was a party to a crime can be inferred from his conduct before, during, and after the commission of the crime. See *Walter v. State*, 304 Ga. 760, 766 (3) (b) (822 SE2d 266) (2018).

7

Here, the evidence showed that Abney fled on foot after Hampton led the police on a chase and stopped the Ford Explorer. Abney concedes this on appeal, but argues that this does not show that he acted in concert with Hampton as Hampton attempted to elude the police. In support of his argument, Abney relies on *Carter v. State*, 249 Ga. App. 354 (548 SE2d 102) (2001), but that case does not apply. In *Carter*, the Court of Appeals reversed a conviction for fleeing from the police because there was no evidence that the defendant "did anything other than occupy the passenger seat" of a vehicle while his accomplice in the crime of hijacking engaged in a high-speed chase with police. Id. at 357 (5). But the Court of Appeals reached this conclusion in *Carter* in part because there was no evidence that the defendant fled on foot after the vehicle stopped. Id. Here, there is such evidence. From this evidence, along with evidence that Hampton and Abney worked in concert to kill the three victims and Abney's affirmative response to Hampton's suggestion during the police chase that Abney get out and run, the jury was authorized to conclude that Abney was a party to the crime

8

of fleeing or attempting to elude a police officer. See *Westmoreland*, 287 Ga. at 693 (4) (b); *Sapp v. State*, 337 Ga. App. 14, 15-16 (785 SE2d 654) (2016).

Although Abney does not challenge the sufficiency of the evidence as to the other crimes of which he was convicted, we have independently reviewed the record and conclude that the trial evidence was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that he was guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Abney argues that the trial court erred in denying his motion for a mistrial in response to a witness's testimony that allegedly violated the court's ruling on a motion in limine. The trial court did not abuse its discretion.

Prior to trial, Abney moved to preclude Hampton's cellmate, David Cowherd, from testifying about Hampton's admissions that inculpated Abney. The trial court granted Abney's motion, and prior to giving his testimony, Cowherd was advised that he was to discuss

only what Hampton admitted doing himself and that Cowherd was not to mention Abney's name. Cowherd stated that he understood this limitation.

After Cowherd testified on direct examination that Hampton admitted to killing the three victims, the State asked Cowherd about the significance of a particular rap song. Cowherd said that law enforcement had played "Bulletproof" for Hampton during a custodial interview, and that Hampton told Cowherd this song was important because "they were listening to it when he got back at the □ the apartment or whatever. They were dancing and listening to that after they done killed them people." During Hampton's cross-examination of Cowherd, Cowherd referred to "two girls" and clarified that there were "[t]wo males, two females." Abney made no objection to Cowherd's testimony on direct examination by the State or during Hampton's cross-examination. Following Cowherd's testimony, Abney moved for a mistrial, arguing that the jury would draw the conclusion from Cowherd's testimony that Abney was involved, given Cowherd's testimony that "they done killed them"

10

and reference to "two males." The trial court denied Abney's motion for a mistrial on the basis that Cowherd's testimony did not identify Abney by name.

Abney takes issue with that ruling, but his arguments are without merit. The decision of whether to deny a mistrial is within the discretion of the trial court, and this Court will not disturb the ruling on appeal "unless it is apparent that a mistrial is essential to the preservation of the right to a fair trial." *Curry v. State*, 305 Ga. 73, 75 (2) (823 SE2d 758) (2019) (citation and punctuation omitted). Contrary to Abney's suggestion, there was no clear violation of the trial court's ruling on Abney's motion in limine. The trial court precluded Cowherd from mentioning Abney by name, and Cowherd complied with that order as he never identified Abney by name. Even if the jury could infer that Cowherd was referring to Abney, as Abney argues, independent trial testimony connected Abney to the crimes, including testimony from Abney's cellmate that Abney admitted to being involved in the murders. Therefore, Abney makes

11

no showing that a mistrial was required to preserve his right to a fair trial.

3. Abney next argues that the trial court erred in overruling two improper bolstering objections to the lead detective's testimony. We disagree.

OCGA § 24-6-620 provides that "[t]he credibility of a witness shall be a matter to be determined by the trier of fact[.]" Under this rule, "[a] witness, even an expert, can never bolster the credibility of another witness as to whether the witness is telling the truth." *Adkins v. State*, 301 Ga. 153, 158 (800 SE2d 341) (2017) (citation and punctuation omitted). "[W]hen we evaluate whether testimony constitutes improper bolstering, we consider the disputed testimony in context[,]" and statements that do not directly address another witness's credibility do not constitute improper bolstering. *Brown v. State*, 302 Ga. 454, 460-461 (2) (b) (807 SE2d 369) (2017).

(a) Abney first argues that the trial court erred in allowing the lead detective to testify about Butler's prior consistent statements. We disagree.

Under the new Evidence Code, a witness's prior consistent statement is "admissible to rehabilitate a witness if the prior consistent statement logically rebuts an attack made on the witness's credibility[,]" OCGA § 24-6-613 (c), and the witness testifies at the trial and is subject to cross-examination, OCGA § 24-8-801 (d) (1) (A). A prior consistent statement is not permitted to rehabilitate a general attack on a witness's credibility, but may be "offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive" if the statement was "made before the alleged recent fabrication or improper influence or motive arose." OCGA § 24-6-613 (c); see also *Dorsey v. State*, 303 Ga. 597, 603 (3) (814 SE2d 378) (2018).

Abney claims that, in cross-examining Butler, he did not make any affirmative charges of recent fabrication, improper influence, or improper motive. But he acknowledges that he asked Butler questions designed to show that Butler changed her story, particularly with respect to him, and that her most recent version developed only after she decided to become a witness for the State.

13

The record confirms that Abney and Hampton both asked questions about Butler's cooperation with the State, getting her to admit that she entered into a favorable plea agreement with the State to drop the murder charges against her in exchange for her testimony against Hampton and Abney and that her sentence would depend on her testimony. Abney specifically asked Butler, "Obviously, if you didn't get a deal, you wouldn't be here testifying; would you?"

Through this questioning, Abney was clearly implying that Butler had an improper motive to testify □ to receive the benefit of a plea deal by receiving a lesser sentence. See *Moon v. State*, 288 Ga. 508, 511 (4) (705 SE2d 649) (2011) (questioning a witness about whether he would receive a lesser sentence as part of a plea deal if he agreed to testify against a defendant is "a classic example of an implication of improper motive for testifying"). The disputed testimony concerned Butler's prior statements to police that predated this alleged improper motive, as Butler made the challenged statements in October 2015 during the investigation of the crime and prior to the return of the indictment charging her,

14

Abney, and Hampton with murder and other crimes. Because the prior consistent statements rebutted a charge of improper motive, the trial court did not err in admitting them. See *Bolling v. State*, 300 Ga. 694, 700-701 (3) (797 SE2d 872) (2017) (witness's statements made before plea offer were admissible to rebut suggestion that witness fabricated his testimony in order to receive benefit of a plea offer).

(b) Abney next argues that the trial court erred in allowing the lead detective to introduce prior consistent statements of Washington, the fellow prisoner who testified about Abney's admission to participating in the crime. Abney fails to show that the prior consistent statements were actually admitted.

During the disputed testimony, the detective testified that his investigation of recorded jail phone calls involving Abney confirmed what Washington reported about those phone calls. The lead detective did not testify about the substance of Washington's statements to the detective, however, other than noting

15

Washington's statements about the timing of those calls.[2] Thus, the record does not show that the lead detective testified about Washington's prior consistent statements.

To the extent Abney argues that the detective's testimony nevertheless improperly bolstered Washington's testimony, the detective did not opine on or speak directly to Washington's truthfulness. Instead, the testimony was responsive to questions about the manner in which the detective conducted his investigation and whether that investigation produced other evidence that was consistent with information provided by Washington. This type of testimony does not constitute improper bolstering. See, e.g., *Davis v. State*, 306 Ga. ___, ___ (3) (f) (___ SE2d ___) (2019); *Jones v. State*, 299 Ga. 40, 44 (3) (785 SE2d 886) (2016). This claim has no merit.

*Judgment affirmed. All the Justices concur.*

---

[2] The detective stated that at the time Washington came forward, the details of the phone calls were not made available to the defense or anyone else, suggesting that Washington had to have learned about them through Abney.

DECIDED AUGUST 5, 2019.

Murder. Chatham Superior Court. Before Judge Abbot.

*Steven L. Sparger*, for appellant.

*Meg E. Heap, District Attorney, Matthew Breedon, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine D. Emerson, Assistant Attorney General*, for appellee.