308 Ga. 797
FINAL COPY

S20A0482.  HAMPTON v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant James Angelo Hampton was tried together with Dwayne Abney and convicted of three counts of malice murder and several other crimes in connection with the shooting deaths of Kiana Marshall, Isaiah Martin, and Alexis Kitchens. On appeal, Appellant contends that the trial court erred by admitting the hearsay testimony of a jailhouse informant and by excluding the testimony of Appellant's proposed alibi witness. We see no reversible error, so we affirm.[1]

---

[1] Marshall, Martin, and Kitchens were killed on October 22, 2015. On December 22, 2015, a Chatham County grand jury returned a 43-count indictment against Appellant, Abney, and Diamond Butler. Appellant was charged with conspiracy to commit malice murder; three counts of malice murder; nine counts of felony murder; four counts of aggravated assault (three against Marshall, Martin, and Kitchens, and the fourth against Jermaine Young for a shooting that occurred in September 2015); burglary; 11 counts of possession of a firearm during the commission of a felony (one relating to the crime against Young); two counts of possession of a firearm by a first-offender probationer (one relating to the crime against Young); and fleeing or attempting to elude a police officer. Butler entered a non-negotiated guilty plea and testified at the joint trial of Appellant and Abney, which took place from

1. As this Court explained in the appeal of Appellant's co-defendant Abney:[2]

> Viewed in the light most favorable to the verdicts, the trial evidence showed that in early October 2015, Marshall allowed Jamaica Bell and Diamond Butler to move in with her in a house she was renting in Savannah. Things did not go well, and Marshall complained about Bell and Butler being messy and inviting guests with guns over to the house. Bell and Butler failed to pay their promised share of the rent, so on the morning of October 21, 2015, Marshall asked them to move out. At some point that day, Martin (Marshall's brother) and Kitchens (Marshall's friend) went to the house to make sure Bell and Butler left. Martin told the women to remove their things from the house or Marshall would call the police.
>
> Butler called Appellant, [a first-offender probationer,] who arrived sometime later with Abney driving a dark grey Honda Accord. Appellant, Abney,

December 1 to 8, 2017. The jury found Appellant not guilty of the counts related to Young, but guilty of the remaining counts. On December 15, 2017, the trial court sentenced Appellant to serve three consecutive sentences of life in prison without parole for the malice murder counts and a total of 35 consecutive years for the remaining counts that were not vacated or merged. Appellant filed a timely motion for new trial, which he later amended with new counsel. The trial court denied the motion on August 27, 2019, although it vacated Appellant's sentence for fleeing or attempting to elude a police officer. Appellant then filed a timely notice of appeal, and his case was docketed in this Court to the term beginning in December 2019 and submitted for a decision on the briefs. Abney also was convicted of three counts of murder and several other crimes; this Court affirmed his convictions in *Abney v. State*, 306 Ga. 448 (831 SE2d 778) (2019), which raised issues different than those raised by Appellant.

[2] Because Hampton is now the appellant at issue, throughout this quoted passage the original "Hampton" has been changed to "Appellant." These changes are not indicated with brackets.

Butler, and Bell left the house in Appellant's car and made a few stops, including at a convenience store around 11:30 p.m. Butler saw that Appellant and Abney both had firearms; Appellant had a 9mm handgun, and Abney had a .380 handgun. After hearing that Marshall was planning to call the police if the women did not remove their belongings from the house that night, Bell and Butler, along with Appellant and Abney, returned to the house and began to pack their things. Bell and Butler could not fit all of their belongings into the trunk of Appellant's car, so they asked Marshall, who had arrived at the house by this point, if they could come back later to retrieve the remaining items. Marshall said no. Appellant, while alone with Butler, asked if she wanted him to "wet that s**t," meaning shoot up the house, and Butler said yes. The group left Marshall's house; Butler thought they were going to return so that she could shoot up the house.

Appellant dropped off Bell and Butler at [Travarius Gray's] house where Appellant had been staying. Butler tried to stay in the car because she wanted to go shoot at Marshall's house, but Appellant insisted that she stay at [Gray's] house. Appellant and Abney then drove back to Marshall's house, went inside, and shot Martin, Marshall, and Kitchens. The three victims were shot multiple times and died from their injuries. Marshall's neighbors reported hearing multiple gunshots around 12:30 a.m. on October 22, 2015, and one neighbor saw a grey Honda Accord drive away quickly after the shooting.

Appellant and Abney returned to Butler and Bell about 20 minutes after dropping off the women. Appellant told Butler that he had "killed all three of them." Abney, Appellant, Butler, and Bell then smoked marijuana, drank, and listened to music. Bell and Butler left Abney

and Appellant that morning.[3]

Butler met Appellant and Abney later that day. While Appellant drove around in a brown Ford Explorer, the group discussed the murders. Appellant again admitted to killing the three victims, and Abney agreed with Appellant's account of the shooting. While in the vehicle, Abney had a .380 handgun; Appellant stated that his 9mm gun was "gone."

Police had already been looking for Appellant and the brown Ford Explorer because Appellant had shot at someone else several weeks earlier while driving the vehicle. When a police officer saw the Ford Explorer, he turned on his police lights and sirens to initiate a traffic stop, but Appellant accelerated. The officer gave chase, and Appellant told Abney and Butler that they could get out and run. Abney agreed, and so when Appellant stopped the Explorer, Abney, Appellant, and Butler fled on foot, running in different directions. The officer apprehended Abney after a short chase, backtracked along Abney's flight path, and recovered a .380 handgun. Appellant was found and arrested the next day.

While searching the murder scene, police recovered eight 9mm shell casings with a "BHA" brand name that were later determined to have been fired from the same gun, a Hi-Point 9mm pistol. The bullets recovered from the three victims were consistent with being fired from a Hi-Point 9mm pistol. During a search of Appellant's residence, police recovered an empty box of BHA 9mm ammunition. Police also found a photo on Appellant's cell

---

[3] Abney told Butler that Martin was still breathing when he and Appellant left Marshall's house. Butler testified that while the group was listening to music, Appellant rapped along and made up his own lyrics, including the line "Die n***a, die," and he mimicked someone choking to death. The lead detective testified that Martin had vomited before he died, which indicated that he could have been struggling to breathe.

phone [taken about an hour before the murder] showing him holding a [Hi-Point] pistol.

*Abney v. State*, 306 Ga. 448, 449-451 (831 SE2d 778) (2019).

A firearms examiner testified that BHA is a rare brand of ammunition. One "Federal"-brand 9mm shell casing was also found at the crime scene, and a container holding Federal-brand bullets was found in Appellant's bedroom.

According to Appellant's cellmate, while in jail awaiting trial, Appellant told the cellmate that he killed three people because "somebody got kicked out the house or something." Appellant described how Marshall was positioned when he shot her (which was the same position in which her body was found); said that he used a Hi-Point 9mm pistol with eight rounds; and said that the police would not be able to find the pistol. While Appellant and Abney were in jail, Appellant gave Abney two letters detailing a false alibi that Appellant wanted Abney to support, which involved the two of them spending the evening buying drugs and smoking marijuana at home.

Abney told a fellow inmate, Eric Washington, that when he and

Appellant went inside Marshall's house, Appellant shot and killed Marshall, Martin, and Kitchens. Abney also told Washington that he planned to use a false alibi and sought Washington's advice about whether it would be successful. Abney's proposed alibi was that after he and Appellant dropped off Butler and Bell at Gray's house, Appellant dropped Abney off at his girlfriend's house, where he stayed for the rest of the night. Abney said that he had explained the alibi to his girlfriend and asked her to support it, which was confirmed by audio recordings from the jail of phone conversations between him and his girlfriend. Abney's false alibi did not match the false alibi that Appellant asked Abney to support, and it did not include Appellant at all.[4]

Appellant and Abney did not testify at their trial. Appellant's theory of defense was that no physical evidence linked him to the

---

[4] At trial, the prosecutor asked the lead detective about Abney's proposed false alibi. After the detective described the alibi, the prosecutor asked, "And that's different than the steps laid out by [Appellant]; isn't it?" The detective replied, "It is." The prosecutor then asked, "If they were together that night, not committing a murder, wouldn't they have the same story?" to which the detective replied, "Yes, they should." During closing argument, the prosecutor focused on Washington's testimony only as it implicated Abney.

crimes, that the witnesses who testified that he was involved were not credible, and that someone else committed the murders.

Appellant does not dispute the legal sufficiency of the evidence supporting his convictions. Nevertheless, as is this Court's general practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Abney*, 306 Ga. at 452. See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. During the trial, Appellant filed a motion to exclude Washington's testimony about Abney's jailhouse statements on the ground that it would violate Appellant's Confrontation Clause rights under the United States and Georgia Constitutions. See U.S. Const.

Amend. VI; Ga. Const. of 1983, Art. I, Sec. I, Par. XIV. After hearing a proffer of Washington's proposed testimony, the trial court ruled that Abney's statements were "admissible hearsay." Washington then testified consistently with the proffer. Appellant now contends that the trial court erred by admitting Washington's testimony because it violated his Confrontation Clause rights and because it was inadmissible hearsay.

The trial court did not explicitly rule on Appellant's Confrontation Clause challenge, but in any event, Washington's testimony did not fall within the scope of the Confrontation Clause. Abney's statements to Washington were subject to a Confrontation Clause challenge, including one involving a co-defendant's statements, see *Bruton v. United States*, 391 U.S. 123 (88 SCt 1620, 20 LE2d 476) (1968), only if the statements were testimonial. See *Allen v. State*, 300 Ga. 500, 504 (796 SE2d 708) (2017). "A statement is testimonial if its primary purpose was to establish evidence for use in a future prosecution." Id. Abney made the challenged statements to Washington to get advice about his false alibi, not to

establish evidence for use in a future prosecution. Appellant's constitutional claim is therefore meritless.

As for Appellant's hearsay claim, pretermitting whether he properly raised the claim and whether the trial court erred in admitting the disputed statements, their admission was harmless.

> In determining whether [an] error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so. The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict.

*Perez v. State*, 303 Ga. 188, 191 (811 SE2d 331) (2018) (citation and punctuation omitted). See also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . .").

Viewing the record in this way, the evidence properly admitted at Appellant's trial showed that two entirely unrelated witnesses (Butler and Appellant's cellmate) testified that Appellant confessed to the killings. Although both witnesses were impeached to some extent, the details they gave about Appellant's confessions largely

matched, and Abney's statements to Washington about Appellant's involvement in the murders were entirely cumulative of those confessions.[5] See *Anglin v. State*, 302 Ga. 333, 336 (806 SE2d 573) (2017) ("[T]he erroneous admission of hearsay is harmless where substantial, cumulative, legally admissible evidence of the same fact is introduced."). See also *Perez*, 303 Ga. at 191 (holding that any error in admitting the victim's hearsay statement that the defendant threatened to kill him was harmless because, among other things, the defendant confessed to the police that he shot the victim); *Davis v. State*, 302 Ga. 576, 584 (805 SE2d 859) (2017) (holding that even if a hearsay statement was not admissible, "its admission into evidence was harmless as it was merely cumulative of other evidence at trial").

In addition, the forensic evidence showed that eight BHA-

---

[5] Appellant's trial counsel asked the cellmate on cross-examination whether he received information about the killings from Appellant's discovery packet, rather than from Appellant's supposed confession. The cellmate testified that he had not seen Appellant's discovery packet. The lead detective testified that Butler and the cellmate gave investigators the information about Appellant's confessions, which included details that had not yet been released to the public, before the State sent Appellant his discovery packet.

brand 9mm shell casings and one Federal-brand 9mm shell casing were found at the crime scene, and an empty container for BHA-brand bullets and a container holding Federal-brand bullets were found at Appellant's residence. A firearms examiner testified that BHA is a rare brand of ammunition and all eight BHA casings had been fired from a Hi-Point 9mm pistol; a photo taken on Appellant's cell phone an hour before the murders showed him holding a Hi-Point pistol. This evidence was also consistent with Appellant's confession to his cellmate that he used a Hi-Point 9mm pistol with eight rounds. Accordingly, it is highly probable that the admission of Abney's statements to Washington did not contribute to the guilty verdicts. See *Perez*, 303 Ga. at 191; *Anglin*, 302 Ga. at 336; *Glispie v. State*, 300 Ga. 128, 132 (793 SE2d 381) (2016).

3. Appellant contends that the trial court erred by excluding the testimony of his proposed alibi witness, Travarius Gray, and by allowing Abney's counsel to advise Gray about his right against self-incrimination. Before Appellant called Gray to testify, the prosecutor told the court that she planned to elicit from Gray, on

cross-examination, testimony that Gray sold Appellant a gun of the type used in the crimes about a month before the murders, and because Gray was a convicted felon at that time (he had recently pled guilty to voluntary manslaughter and possession of a firearm by a convicted felon), it was illegal for him to possess the pistol. The prosecutor explained, "[Gray] gave a statement to [the lead detective] in this case . . . . And in that statement, he talks about selling [Appellant] a Hi-Point nine millimeter, the one we've been talking about, about a month prior to this." The prosecutor argued that requiring Gray to testify could implicate his right against compelled self-incrimination under the Fifth Amendment to the United States Constitution, and that his entire testimony should be excluded because she would not be able to thoroughly cross-examine Gray if he invoked that right. The trial court then accepted an offer from Abney's counsel to advise Gray about his right against self-incrimination.

Abney's counsel met with Gray in the court's holding cell and advised Gray about his Fifth Amendment right. Gray then told the

court that if he were asked during cross-examination about his possession of firearms, he would invoke his right against self-incrimination. Appellant argued that Gray should still be allowed to testify; the court replied, "The law [is] . . . that should [Gray] assert his Fifth Amendment rights on cross-examination[,] then his entire testimony must be stricken." Appellant's counsel then proffered that Gray would have testified that he was smoking and drinking with Appellant in his house at the time of the murders; that Appellant shared the bedroom where investigators found the Federal-brand bullets with a woman named Alliyah Green; that the grey Honda that Appellant was driving on the night of the murders belonged to Green; and that Gray saw Appellant give Green the keys to the car before the murders.

(a) Appellant first argues that allowing Abney's counsel to advise Gray of his Fifth Amendment right deprived Appellant of his due process rights under the United States and Georgia Constitutions. But Appellant did not raise a due process claim at trial, so this claim was not properly preserved for review on appeal.

See *McDuffie v. State*, 298 Ga. 112, 117 (779 SE2d 620) (2015).

(b) Appellant next contends that the trial court abused its discretion in excluding Gray's testimony. When a witness indicates his intent to invoke his right against compelled self-incrimination, "[f]irst, the trial court is required to decide whether there is a real and appreciable danger that the answer *could* incriminate the witness. If so, then the decision to answer must be left to the witness." *Cody v. State*, 278 Ga. 779, 780 (609 SE2d 320) (2004) (emphasis in original). See also *Brown v. State*, 295 Ga. 804, 809-810 (764 SE2d 376) (2014).

By requiring that Gray be advised of his right against self-incrimination after the prosecutor proffered her planned cross-examination of him, the court implicitly and reasonably decided that there was a real and appreciable danger that Gray's answers regarding his possession of a gun of the type used in the murders and his sale of that pistol to Appellant could have incriminated Gray at least as a felon in possession of that firearm. And after making that determination, the trial court properly then left the decision to

testify to Gray.

Appellant also argues that the trial court should have concluded that Gray's testimony related only to a collateral matter. Generally,

> [i]f the witness's refusal to answer . . . denies a party a thorough and sifting cross-examination of the specifics of the witness's testimony on direct, then the trial court is authorized to strike that witness's direct testimony. However, if the invocation of the privilege relates to a collateral issue or to his general credibility, then the testimony need not be stricken.

*Cody*, 278 Ga. at 780-781 (citation omitted).

According to the proffers, during direct examination, Gray would have testified to Appellant's whereabouts during the murder; on cross-examination, the prosecutor would have asked Gray about how Appellant obtained the murder weapon. Both the proffered direct examination and cross-examination were directly related to Appellant's involvement in the crimes. To the extent Gray testified that Appellant was not involved in the crimes, Gray could also fairly be asked about Appellant's possession of the type of gun used in the crimes, which was not a merely collateral matter. The prosecutor did

not seek to ask Gray about his possession of weapons unrelated to Appellant's crimes. Compare *Mercer v. State*, 289 Ga. App. 606, 609 (658 SE2d 173) (2008) (concluding that a witness's invocation of his right against self-incrimination was collateral because the questions asked on cross-examination concerned his possession of a gun that was not used in the crimes). The trial court therefore did not abuse its discretion in concluding that it would have to strike Gray's proffered testimony regarding Appellant's alibi if he invoked his right against self-incrimination when asked about the gun he sold to Appellant. Gray's proffered testimony was properly excluded.

(c)  Next, Appellant argues that under OCGA § 24-1-104 (a), the State "should" have filed a pretrial motion for a preliminary ruling on the admissibility of Gray's testimony. OCGA § 24-1-104 (a) lays out the general standard for trial court rulings on "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence[,]" but it does not require that the State file a pretrial motion for rulings on preliminary questions; the only requirement

that may be pertinent here is that hearings on preliminary matters of this sort "shall be conducted out of the hearing of the jury when the interests of justice require[.]" OCGA § 24-1-104 (c). The State's challenge to Gray's testimony, Gray's statement to the trial court that he would invoke his right against self-incrimination, and Appellant's proffer of Gray's proposed testimony all took place outside the presence of the jury. Moreover, Appellant also could have sought a preliminary ruling on the admissibility of Gray's proposed testimony, but he did not. Accordingly, his argument lacks merit.

(d)  Finally, Appellant argues that the State "could" have sought "use immunity" for Gray pursuant to OCGA § 24-5-507.[6] This

---

[6] The pertinent portion of OCGA § 24-5-507 (a) says:
    Whenever in the judgment of the Attorney General or any district attorney the testimony of any person or the production of evidence of any kind by any person in any criminal proceeding before a court or grand jury is necessary to the public interest, the Attorney General or the district attorney may request in writing the superior court to order such person to testify or produce the evidence. Upon order of the court, such person shall not be excused on the basis of the privilege against self-incrimination from testifying or producing any evidence required, but no testimony or other evidence required under the order or any information directly or indirectly derived from such testimony or evidence shall be used against the person in any proceeding or prosecution for a

argument also is without merit. Although the Attorney General or a district attorney *may* seek immunity for a witness, nothing in the statute *requires* the prosecutor to do so. See OCGA § 24-5-507 (a). See also *Brown*, 295 Ga. at 811 ("We . . . squarely hold that Georgia law does not authorize a trial court to grant use immunity to a witness at the request of a defendant."); *United States v. Georgia Waste Systems*, 731 F2d 1580, 1582 (11th Cir. 1984) ("The Government's power to grant immunity is discretionary and . . . defendants have no right to subject its decision to judicial review.").

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 18, 2020.
Murder. Chatham Superior Court. Before Judge Abbot.
*David T. Lock*, for appellant.
*Meg E. Heap, District Attorney, Matthew Breedon, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.

crime or offense concerning which he or she testified or produced evidence under court order. . . .