311 Ga. 158
FINAL COPY

S20A1528.  McGARITY v. THE STATE.

LaGrua, Justice.

Appellant Chanze Labron McGarity was convicted of malice

murder and other crimes in connection with the shooting death of

James Hendon.[1]  On appeal, Appellant contends that the trial court

---

[1] The crimes occurred on November 16, 2013. In June 2014, a Paulding County grand jury indicted Appellant for malice murder, felony murder, aggravated assault of Hendon, aggravated assault of Eddie Head, simple battery of Hendon, simple battery of Head, four counts of possession of a firearm during the commission of a felony, and possession of a firearm by a first offender probationer.  At a jury trial in February 2015, Appellant was found guilty of malice murder, felony murder, three counts of possession of a firearm during the commission of a felony, aggravated assault of Hendon, reckless conduct as to Head (as a lesser included offense of aggravated assault), both counts of simple battery, and possession of a firearm by a first offender probationer.  The jury found Appellant not guilty of the firearm possession count predicated on the aggravated assault of Head.  The trial court sentenced Appellant to serve life in prison without the possibility of parole for the malice murder conviction, concurrent twelve-month terms for the simple battery and reckless conduct convictions, a consecutive five-year term for firearm possession during the malice murder, and a concurrent five-year term for firearm possession by a first offender probationer.  The remaining counts merged or were vacated by operation of law.  Appellant filed a timely motion for new trial in February 2018, which he amended through new counsel in September 2019.  After a hearing, the trial court denied the motion in December 2019. Appellant then filed a timely notice of appeal.  The case was docketed to this Court's August 2020 term and submitted for a decision on the briefs.

erred by (1) limiting Appellant's cross-examination of certain witnesses concerning their prior convictions; (2) allowing a law enforcement officer to offer testimony regarding certain witnesses' prior consistent statements; and (3) permitting a witness to testify after refreshing her recollection with a document that was not provided to the defense before trial. We conclude that, while the trial court improperly admitted the prior consistent statements of three witnesses, such error requires reversal of Appellant's convictions on only two counts. Accordingly, we affirm in part and reverse in part.

1. The evidence presented at trial showed the following.[2] On the evening of November 16, 2013, Hendon was shot and killed in the parking lot outside Mr. G's, a Paulding County convenience store. A responding officer found a single shell casing on the ground

---

[2] Because this case requires an assessment of the harm of alleged trial court error, we present the evidence as jurors reasonably would have viewed it, rather than in the light most favorable to the verdicts. See *Hampton v. State*, 308 Ga. 797, 802 (2) (843 SE2d 542) (2020) ("In determining whether [an] error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." (Citation and punctuation omitted.)).

in close proximity to Hendon's body.  Witnesses at the scene told an investigator that four men had fled the scene on foot.  No suspects were apprehended that evening.

At trial, Jeffrey Berry, who described himself as a friend of Appellant, testified that on the evening of the shooting he was at Mr. G's when Appellant and Eddie Head, another friend, entered the store, arguing.  At some point thereafter, Berry exited the store and saw Appellant, Head, and a third friend, Steve White, arguing.  Berry "just kind of fell back, just waited off to the side."  Appellant walked up closer to Berry, and Head and White were still standing together, "arguing a little bit."  Then Hendon walked by "kind of close towards" Appellant, prompting Appellant to say, "Hey, what's wrong with you?  There's things going on here."  Hendon turned around and replied, "Excuse me?"  Appellant turned and slapped Hendon in the face, and Hendon "went down."  Hendon appeared to be preparing to defend himself, "[a]nd then the next thing you know [Appellant] grabbed him and put him up against the wall and then pulled the pistol.  And that's when he shot him."  Everyone in the

3

vicinity ran, including Berry, White, Head, and Appellant.

Berry described the gun Appellant had that night as a dark-colored gun and testified that he had known Appellant to carry a nine-millimeter gun. In addition, Berry testified that he had seen Appellant on one occasion after the shooting "at church." They exchanged greetings, and Appellant told Berry to "tell them folks that [Head] shot that guy." Appellant offered, in exchange, to help find someone to cosign on a loan with Berry.

Head testified that on the night of the shooting, he walked up the street to Mr. G's from a nearby apartment complex, Merchants Court, to purchase cigarettes. As soon as he exited the store, Appellant hit him in the face, and Head stumbled to the ground. Head testified that, when he got up to defend himself, Appellant pressed a black gun into his abdomen, and Head backed up. White, an acquaintance, walked up to help, telling Head to calm down. Head and White walked away and stood "a little ways from the building." Appellant remained near the building, "pacing . . . like he wanted to fight." Hendon then appeared, and Head saw Appellant

4

hit Hendon in the face with his gun and then shoot him. Head fled and returned to Merchants Court.

White testified that, on the night of the shooting, he was leaving his girlfriend's apartment at Merchants Court to walk to Mr. G's when he encountered Appellant. White's friend, Autumn Barner, was leaving the apartment complex at the same time and offered them a ride. When they arrived at the shopping plaza where Mr. G's was located, the men exited the car. Head was walking out of the store, and Appellant and Head started fighting. White broke up the fight, told Appellant to go into the store, and walked away with Head. As they walked, Head kept "telling [White] to turn around," but White continued walking away to avoid further conflict. White then heard a "pop" and turned to see Appellant running away with what White believed was a gun. In response to the "pop," White ran away, back to Merchants Court.[3]

Two additional witnesses, both cousins of Appellant, testified

---

[3] Barner testified that, while she did see the altercation between Appellant and Head, she did not see or hear the shooting.

5

that they saw Appellant at Mr. G's just prior to the shooting. Both witnesses had left the store by the time of the shooting, though both were close enough to hear the gunshot.

Victoria Thompson, White's girlfriend, testified that on the night of the shooting, White returned to her apartment from the store, shaken. White told Thompson that Appellant and Head had "got into it" and that, while White was trying to break up the fight, he heard a gunshot behind him.

Ty McClarity, Thompson's roommate and Appellant's girlfriend at the time, testified that Appellant had been at her apartment in Merchants Court on the day of the shooting when she left for work. When she returned home that night, White was "pacing" in the breezeway outside her apartment, saying "I don't know why bro did that," which she interpreted to mean that "[Appellant] had did something." Appellant never returned to McClarity's apartment.

Vivian Washington, a friend of Appellant, testified that, on the day after the shooting, Appellant called to ask her to pick him up,

6

and he stayed overnight at her apartment. The next day, Washington purchased nine-millimeter bullets for Appellant at his request. The following night, Appellant arrived at Washington's apartment unannounced and went to rest in her bedroom. Law enforcement officers arrived shortly thereafter and arrested Appellant. Washington consented to a search of her apartment, where officers found a black nine-millimeter handgun in Washington's bedroom. Washington testified that the gun was not hers and that she assumed it belonged to Appellant. Testing later confirmed that the bullet recovered from Hendon's body during his autopsy was fired from the gun recovered at Washington's apartment, and DNA obtained from the gun was matched to Appellant.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's soon-to-end practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and

7

summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted.[4] See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Davenport v. State*, 309 Ga. 385, 397 (4) (b) (846 SE2d 83) (2020) (in assessing the sufficiency of the evidence for purposes of constitutional due process, "we consider *all* the evidence admitted at trial, regardless of whether the trial court erred in admitting some of that evidence" (emphasis in original)); *Vega v. State*, 285 Ga. 32, 33 (1) (673 SE2d 223) (2009) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (Citation and punctuation omitted.)).

2. Appellant contends that the trial court erred by limiting Appellant's cross-examinations of White and Berry about their prior

---

[4] This Court will end its practice of considering the sufficiency of the evidence sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 385, 399 (4) (b) (846 SE2d 83) (2020). The Court began assigning cases to the December term on August 3, 2020.

convictions, in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution. Specifically, Appellant contends that the limitations on his cross-examination hampered his ability to explore "[t]he relationship of these witnesses, the possibility of gang affiliation, [and] the circumstances of [the witnesses'] drug convictions," which were, he claims, relevant to his defense. We discern no merit in this contention.

Prior to trial, the State filed a motion in limine requesting that the trial court limit the defense's cross-examination with respect to the details of certain witnesses' prior convictions. The State argued that only the offenses charged and their time and place should be admissible. In response, defense counsel argued that information regarding these crimes "might be relevant to [the defense's] theory of the case" and requested that the trial court defer ruling until the issue arose at trial. The trial court noted that it generally agreed with the State but invited defense counsel to let the court know if a concern arose during trial, stating that the court "[would] be glad to take it up" at that time. Defense counsel did not offer any further

9

indication as to what additional information the defense might seek to elicit or why it might be relevant.

At trial, White testified on direct examination that he had previously been convicted of aggravated assault, possession of a firearm during the commission of a felony, theft by receiving, and violation of the Georgia Controlled Substances Act. Similarly, Berry testified on direct examination as to his prior convictions for theft by receiving, violation of the Georgia Controlled Substances Act, escape, and financial transactions fraud. Defense counsel did not seek to elicit any additional information regarding the prior convictions while cross-examining either witness. Nor did the defense seek to revisit this issue with the trial court at any point during the trial. Defense counsel did, however, elicit that White was on probation at the time of the shooting and that Berry was in jail at the time he came forward with information about the shooting.

To obtain ordinary appellate review of a trial court's ruling excluding evidence, "the substance of the evidence [must have been] made known to the court by an offer of proof or [been] apparent from

10

the context[.]"  OCGA § 24-1-103 (a) (2).  See also *Walker v. State*, 301 Ga. 482 (3) (801 SE2d 804) (2017).  Thus, to preserve an objection to the exclusion of evidence, the proponent must either make an offer of proof or otherwise ensure that "the *reason* for offering the evidence in question [is] apparent to the trial court." *Williams v. State*, 302 Ga. 147, 151 (2) (805 SE2d 873) (2017) (emphasis in original).  Because Appellant did neither, he has waived his right to ordinary appellate review, and this enumeration is reviewable only for plain error.  See *Walker*, 301 Ga. at 487.

> To establish plain error, Appellant must show that
>
> (1) the error was not affirmatively waived by the appellant; (2) the error is "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected the appellant's substantial rights"; and (4) "the error seriously affects the fairness, integrity or public reputation of judicial proceedings."

*Williams*, 302 Ga. at 151-152 (citation omitted).  "Satisfying all four prongs of this standard is difficult, as it should be."  *Walker*, 301 Ga. at 485 (citation and punctuation omitted).  Meeting this standard is all the more difficult where error is asserted based on the exclusion

11

of evidence that the proponent has failed to specifically identify.  See id. at 488 (explaining that the appellant's "failure to make the evidence known to the court . . . all but dooms his claim under plain error review").  Indeed, the failure to do so

> makes it impossible to determine that the [evidence at issue] would have been admissible at trial, much less that [its] admissibility was so clear or obvious as to be beyond reasonable dispute.  Likewise, without informing [this Court] what the [evidence would show], Appellant cannot meet his burden to show that there is a reasonable probability that, but for [its] exclusion at trial, the outcome would have been more favorable to him.

Id. (citations and punctuation omitted).  Accordingly, Appellant has demonstrated no error — plain or otherwise — with regard to this issue.  See *Parker v. State*, 309 Ga. 736, 743-744 (4) (848 SE2d 117) (2020) (where appellant failed to apprise trial court of substance of evidence he claims to have been erroneously excluded, he has not preserved ordinary error and cannot demonstrate plain error).

3.  Appellant also contends that the trial court erred by allowing Captain William Gorman of the Dallas Police Department to testify as to the statements made to him by Head, White, and

Barner on the day after the shooting. Appellant asserts that the prior statements improperly bolstered the credibility of these three witnesses. The State contends that Captain Gorman's testimony was admissible as evidence of prior consistent statements to rebut the defense's attacks on these witnesses' credibility and that, even if this testimony should not have been admitted, the error was harmless. We review the trial court's rulings on the admission of evidence for an abuse of discretion. See *Bridgewater v. State*, 309 Ga. 882, 886 (2) (848 SE2d 865) (2020).

Under our current Evidence Code,

[a]n out-of-court statement shall not be hearsay if the declarant testifies at the trial or hearing, is subject to cross-examination concerning the statement, and the statement is admissible as a . . . prior consistent statement under Code Section 24-6-613 or is otherwise admissible under this chapter.

OCGA § 24-8-801 (d) (1) (A). It is undisputed that all of the out-of-court statements Appellant challenges in this enumeration were made by witnesses who testified at trial and were available for cross-examination, and thus the dispositive question is whether the

13

witnesses' prior statements, offered through Captain Gorman's testimony, were admissible as prior consistent statements under OCGA § 24-6-613 (c).[5]

OCGA § 24-6-613 (c), enacted as part of the overhaul of our rules of evidence that took effect on January 1, 2013, see Ga. L. 2011, p. 99, § 2, represents Georgia's first codification of a rule on the admissibility of prior consistent statements. See *Walters v. State*, 335 Ga. App. 12, 13 (780 SE2d 720) (2015). Prior to the adoption of OCGA § 24-6-613 (c), Georgia case law established that prior consistent statements, while not admissible as substantive evidence to bolster or fortify a witness' trial testimony, could be admitted in the narrow circumstance where (1) a witness was impeached by some "affirmative charge[ ]" that the witness' testimony was tainted by "recent fabrication, improper influence, or improper motive" and (2) the prior statement predated the alleged fabrication, influence, or motive. *Cowart v. State*, 294 Ga. 333, 339-340 (4) (a) (751 SE2d

---

[5] No argument has been made, nor do we conclude, that the statements were "otherwise admissible" under the pertinent chapter of the current Evidence Code.

14

399) (2013); see also *Woodard v. State*, 269 Ga. 317, 320 (2) (496 SE2d 896) (1998), overruled on other grounds by *Bunn v. State*, 291 Ga. 183 (728 SE2d 569) (2012). Our pre-2013 decisional law was largely modeled after the federal approach to the admission of prior consistent statements as substantive evidence. See *Cowart*, 294 Ga. at 340 (citing *Tome v. United States*, 513 U.S. 150, 158 (115 SCt 696, 130 LE2d 574) (1995)); *Woodard*, 269 Ga. at 320 (noting standard of admissibility under the analogous federal evidence rule).

In enacting OCGA § 24-6-613 (c), the legislature both codified our pre-2013 approach and broadened the range of circumstances in which prior consistent statements are to be deemed admissible. OCGA § 24-6-613 (c) provides:

> A prior consistent statement shall be admissible to rehabilitate a witness if the prior consistent statement logically rebuts an attack made on the witness's credibility. A general attack on a witness's credibility with evidence [pertaining to character or prior criminal convictions] shall not permit rehabilitation under this subsection. If a prior consistent statement is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive, the prior consistent statement shall have been made before the alleged recent fabrication or improper influence or

15

motive arose.

While the final sentence of the Code section effectively codifies our prior decisional law, see *Cowart*, 294 Ga. at 340 n.10, the first two sentences expand the admissibility criteria to cover prior statements offered to rehabilitate a witness against *any* attack on a witness' credibility, other than that based on character or prior convictions, so long as the prior statement "logically rebuts" that attack. See *Walters*, 335 Ga. App. at 13-14. Reading the Code section as a whole, it is clear that a prior consistent statement will be admissible only if (1) the witness' credibility has been attacked, by some means other than impeachment by evidence of character or prior convictions; and (2) the prior statement "logically rebuts" that attack. Further, if the attack is by a charge of recent fabrication or improper influence or motive, a prior statement may "logically rebut" the attack only if it was made before the alleged fabrication, influence, or motive came about.

Here, during the State's case-in-chief, the State called Captain Gorman to testify about his investigation of the case. In detailing

16

the chronology of his investigation, Captain Gorman testified, over objection, about interviews he had conducted on the day after the shooting with various witnesses, including Head, White, and Barner. All three of these witnesses had already testified. These witnesses' day-after statements, as recounted by Captain Gorman, were largely consistent with their trial testimony.

On cross-examination, all three witnesses were questioned by defense counsel in a manner designed to elicit that they were acquainted with one another as fellow residents at Merchants Court and that they had communicated among themselves prior to giving their day-after statements. The clear implication of this line of questioning was that these witnesses had "huddled up" to spin a narrative implicating Appellant as the shooter. Head and White were also both asked about prior inconsistent statements they made to the police on the night of the shooting.

Appellant contends that these witnesses' day-after statements were improperly admitted under *Cowart* and OCGA § 24-6-613 (c) because the statements were made after the witnesses' alleged

17

collusion with one another. So far as this argument goes, we agree with it: because these witnesses' day-after statements were not made "before the alleged recent fabrication . . . arose," OCGA § 24-6-613 (c), they could not be offered to logically rebut the attacks on the witnesses' credibility based on such fabrication. See *Cowart*, 294 Ga. at 341 (written proffer made during plea negotiations was not admissible at trial because the witness had the same alleged motive to fabricate — to curry favor with the State — at the time he made the proffer). As to Barner, because the only mode of attack on her credibility was via the allegation of collusion to fabricate, her day-after statement was not admissible. Thus, the trial court abused its discretion in admitting Barner's prior consistent statement.

The analysis with regard to Head's and White's day-after statements, however, is not as clear-cut. Head admitted on cross-examination that, on the night of the shooting, Head told Captain Gorman that he "knew nothing" about it. Similarly, White was cross-examined regarding a statement he made to a different officer on the night of the shooting, in which, the cross-examination

18

implied, he had failed to mention seeing a gun in Appellant's hand. Thus, Appellant elicited prior inconsistent statements from these two witnesses, although it is not clear that the theory behind that mode of impeachment was different than the claim of fabrication, with the earlier inconsistent statements elicited simply to support the suggestion that the witnesses had then colluded to change their stories.

Whether such an additional possible theory of impeachment makes a difference under Georgia's expanded parameters of admissibility for prior consistent statements is a question that the parties have not addressed. Nor is there any indication that the trial court relied on such an unargued theory, rather than the traditional charge-of-fabrication theory, in admitting any of the prior consistent statements. The State cites no Georgia case law supporting the admission of Head's and White's prior consistent statements on this ground, nor have we found any.[6] To the extent that we should look

---

[6] The State has cited several cases for the broad proposition that prior consistent statements are admissible whenever they logically rebut any attack

19

to analogous federal case law as persuasive, that case law would not

support the admission of the prior consistent statements in this case

to logically rebut prior inconsistent statements made in different

interviews on the previous day, particularly when an alleged motive

to fabricate arose during the time between the initial and the day-

after statements.[7]  For these reasons, we hold that the trial court

on a witness' credibility.  But we have noted pointedly that, even under OCGA § 24-6-613 (c), "[a] prior consistent statement is not permitted to rehabilitate a general attack on a witness's credibility."  *Abney v. State*, 306 Ga. 448, 453 (3) (a) (831 SE2d 778) (2019).  And the cases the State cites are largely charge-of-fabrication cases.  See *Glover v. State*, 309 Ga. 102, 108 (3) (844 SE2d 743) (2020) (detective's testimony about witness' statement made hours after shooting admissible where it rebutted defense's implication of fabrication); *Abney*, 306 Ga. at 454 (detective's testimony about witness' statement admissible where statement made prior to motive to fabricate arose); *Dorsey v. State*, 303 Ga. 597, 603 (3) (814 SE2d 378) (2018) (no error in admitting witness' prior consistent video-recorded statement "[b]ecause the thrust of [appellant's] cross-examination was a charge that [the witness] fabricated a different version of events after giving his written statement").

[7] We note that the analogous federal rule of evidence, Rule 801 (d) (1) (B), was amended in 2014, three years after Georgia's current Evidence Code was enacted, to broaden the range of prior consistent statements that are admissible as substantive evidence.  The federal rule now allows admission as non-hearsay not only of statements offered to rebut a charge of recent fabrication but also statements offered "to rehabilitate the declarant's credibility as a witness when attacked on another ground[.]"  Fed. R. Evid. 801 (d) (1) (B) (ii).  This language is similar to, though not the same as, OCGA § 24-6-613 (c)'s provision allowing prior consistent statements that "logically rebut[ ] an attack made on the witness's credibility."  As noted in a leading treatise, it is clear from the Advisory Committee Notes to the 2014 amendment that this change to the federal rule does not actually expand the scope of

20

also abused its discretion in admitting Head's and White's prior consistent statements.[8] That holding, however, does not require reversal of all of Appellant's convictions.

"The improper admission of bolstering evidence is a non-constitutional, evidentiary error." *Cowart*, 294 Ga. at 341. Thus, to determine whether such error requires reversal, we must determine whether it is highly probable that the error did not contribute to the

admissibility of prior consistent statements but rather "only expands the permissible use of such statements once admitted," allowing what had always been admissible for non-substantive rehabilitation purposes to now also be admissible as substantive evidence. 30B Charles Allen Wright and Jeffrey Bellin, Federal Practice and Procedure — Evidence § 6754 (2020 ed.). Regarding the admissibility of prior consistent statements to rehabilitate a witness after impeachment by a prior inconsistent statement, however, it appears that the consensus view among federal courts is that prior consistent statements are admissible only to the extent they "come from the same source," meaning that the two statements were made in the same interview, witness statement, or conversation. Id. Were we to follow those decisions here, Head's and White's prior consistent statements would not be admissible. And the State has offered us no reason to believe that a different approach is warranted in this case under the language of OCGA § 24-6-613 (c) (although we do not rule out the possibility of being persuaded otherwise in a future case).

[8] To the extent the State contends that a particular portion of White's day-after statement, in which he told Captain Gorman he saw a gun in Appellant's hand after hearing the gunshot, was admissible to rebut White's equivocation on cross-examination about whether he actually saw a gun, we note that White actually testified about this portion of his statement on redirect. As the State had thus already elicited that portion of White's prior statement, the State was not entitled to then have this statement repeated by Captain Gorman, which served no purpose other than to bolster White's own testimony about his prior statement.

jury's guilty verdicts. See *Davenport*, 309 Ga. at 389 (2). Where improper bolstering has occurred, this determination must be made without reliance on the testimony that was improperly bolstered, "as the very nature of the error . . . is that it is repetitive of that to which the witness has already testified." *Character v. State*, 285 Ga. 112, 120 (6) (674 SE2d 280) (2009) (citation and punctuation omitted). Instead, "we must consider factors such as whether the [S]tate's case was based primarily on the bolstered testimony, and whether the improper bolstering added critical weight to that testimony." *Silvey v. State*, 335 Ga. App. 383, 391 (2) (a) (780 SE2d 708) (2015) (citation and punctuation omitted). See, e.g., *Cowart*, 294 Ga. at 342-343 (improper bolstering was harmless as to one defendant because of the strength of the evidence against him apart from bolstered testimony, but not harmless as to his co-defendant because the only substantial evidence against him came from the improperly bolstered witness).

Here, most of the State's case did not rest primarily on the testimony of Barner, Head, or White. Barner was a secondary

witness who testified that she neither saw nor heard the shooting. Though both Head and White were significant witnesses, there was ample evidence independent of their testimony to support the jury's verdicts on all the counts involving Hendon's murder. Berry gave a firsthand account describing Appellant hitting and then shooting Hendon. Appellant's girlfriend McClarity testified that she returned to Merchants Court after the shooting to find White "pacing" outside her apartment and making remarks that she interpreted as meaning Appellant "had did something"; she also testified that Appellant never returned to her apartment after the shooting. Appellant's own cousins placed Appellant at the scene minutes before the shooting. Washington testified that she purchased nine-millimeter bullets for Appellant at his request the day after the shooting. Most significantly, at the time of Appellant's arrest two days after the shooting, investigators found, in the bedroom where he was apprehended, a nine-millimeter handgun, which was later determined to have fired the bullet that killed Hendon, and on which Appellant's DNA was later found. In light of

the totality of this evidence, it is highly probable that any prior consistent statements admitted improperly through Captain Gorman did not contribute to the verdicts on the counts involving Hendon. See *Puckett v. State*, 303 Ga. 719, 722 (3) (814 SE2d 726) (2018) (any error in admitting witness' prior consistent statements was harmless, as improper evidence was cumulative of properly admitted evidence from other witnesses and evidence of appellant's guilt was overwhelming).

The same cannot be said, however, for the two counts involving Appellant's confrontation with Head. While other witnesses testified that Appellant and Head were involved in an argument, the only evidence that Appellant hit Head, which was the basis for the simple battery verdict, or placed a gun against his abdomen, which was the basis for the reckless conduct verdict, was the testimony of Head, White, and Barner. Accordingly, because the trial court's error in admitting these witnesses' prior consistent statements to bolster their testimony likely affected the jury's guilty verdicts on those two charges, the error was harmful to that extent and the

24

convictions for those two charges must be reversed.

4. In his final enumeration, Appellant contends that the trial court erred in permitting Deborah Harlow, the GBI forensic biologist who collected the DNA sample from the murder weapon, to refresh her recollection about the firearm's chain of custody with a document that was not produced to the defense before trial. Appellant has failed to establish error in this regard.

The record reflects that Harlow was called to testify only as to the process by which she collected the DNA sample from the gun and not as to the actual testing of the sample, which was conducted by a different witness. Prior to explaining that process, Harlow was asked about the crime lab's procedures for the intake of evidence and documentation of chain of custody. When questioned about the chain of custody of the gun recovered in this case, Harlow referred to a document to refresh her recollection, and defense counsel objected, contending that the State had committed a *Brady/Giglio*[9]

---

[9] See *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194, 10 LE2d 215) (1963); *Giglio v. United States*, 405 U.S. 150 (92 SCt 763, 31 LE2d 104) (1972).

violation by not producing the document and had also violated its statutory duty to "reduce anything that [Harlow] did in this case to writing."[10] The prosecutor responded that this document was merely an "internal computer printout" related to the chain of custody; that he believed all documents had been provided to the defense; and that the "remedy" would be "to give everybody an opportunity to review" the document. The trial court overruled the objection, and Harlow proceeded with her testimony.

Claiming that the report Harlow referred to at trial "differs from a similar report received by defense counsel," Appellant asserts some violation on the State's part that, he claims, has prejudiced his ability to "verify the chain of custody" of the DNA evidence. To the extent Appellant is continuing to assert that the State violated a duty to "reduce . . . to writing" an expert report, see OCGA § 17-16-4 (a) (4), there was no violation here because Harlow was not

---

[10] This latter objection was in apparent reference to OCGA § 17-16-4 (a) (4), which requires the prosecution to produce to the defendant, prior to trial, any "report of . . . scientific tests or experiments, including a summary of the basis for the expert opinion rendered in the report" and to "reduce all relevant and material oral portions of such report to writing."

26

tendered as an expert witness. And to the extent Appellant continues to assert a *Brady/Giglio* violation, Appellant has offered no argument or citation of authority to support this claim, and we thus conclude that it has been abandoned. See Supreme Court Rule 22; *Blount v. State*, 303 Ga. 608, 611 (2) (c) (814 SE2d 372) (2018). We thus see no abuse of discretion in the trial court's allowing Harlow to testify based on her recollections refreshed by the chain of custody document.

*Judgment affirmed in part and reversed in part. All the Justices concur.*

Decided March 15, 2021.
Murder. Paulding Superior Court. Before Judge Beavers.
*William B. Mills*, for appellant.
*Dick Donovan, District Attorney, Ferdinand M. Viscuse, Anthony B. Williams, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney*

*General, Paula K. Smith, Senior Assistant Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.